THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
GREGORY COOPER, Appellant.

Fourth Department, April 12, 1984

2

APPEARANCES OF COUNSEL

*Thomas E. Andrushat* for appellant.

*Richard J. Arcara, District Attorney (Barbara Eberl,* of counsel), for respondent.

OPINION OF THE COURT

HANCOCK, JR., J. P.

██ Defendant was convicted of felony murder arising from the shooting death of a guard during an attempted bank robbery allegedly committed by defendant and four others. He was sentenced to 25 years to life. Of the several grounds urged for reversal we find one to have merit: that the hearing court should have suppressed the videotaped confession recorded after defendant's arrest but prior to his arraignment because it was taken in violation of defendant's rights under the United States and New York State Constitutions. Crucial to defendant's argument is the delay of approximately 24 hours between his arrest shortly before 2:00 P.M. on July 19, 1979, and the filing of the felony complaint and arraignment which took place in the early afternoon of July 20, 1979. The case turns on the effect, if any, of this delay on defendant's critical stage right to counsel (US Const, 6th Amdt, 14th Amdt; NY Const, art I, § 6) which would have accrued earlier were it not for the delay (see *People v Samuels,* 49 NY2d 218) and the effect, if any, of the delay, in combination with other circumstances, on the voluntariness of the confession (US Const, 5th Amdt, 14th Amdt; NY Const, art I, § 6; see *People v Holland,* 48 NY2d 861). For the reasons which follow we hold that the taped statement should have been suppressed and that there should be a new trial. A discussion requires a recitation of the events leading up to the statement as detailed in the trial and suppression hearing.

## I.

An attempted holdup of a branch of the M & T Bank in Buffalo occurred on July 19, 1979. Defendant, his girlfriend Ethel "Teen" Ridgeway, Otis Samuel, Arthur "Satch" Saddler, and Ronald Amerson were charged with the crime. Amerson pleaded guilty and testified for the prosecution against the other four who were tried jointly.

The trial testimony showed that at about 10:00 A.M. defendant entered the bank with Samuel, Saddler and Amerson. Samuel and Saddler were armed. When the bank guard, Warren Lewis, reached for his weapon, Samuel fired, and within seconds, a bullet from Samuel's gun had killed Lewis, and a shot fired by Lewis had hit Saddler. Leaving the injured Saddler at the door of the bank, Samuel, Amerson and defendant made their getaway in a car driven by Ethel Ridgeway. Sometime later, acting on information from Saddler, the police picked up defendant and took him to the bank to see if any bank personnel could identify him. No one could do so. He was released and picked up again shortly thereafter.

The events surrounding defendant's arrest by the police and their involvement with defendant and his father leading ultimately to defendant's confession, as related at the *Huntley* hearing by the involved police officers of the Buffalo Police Department, are as follows. Sergeant Dove testified that at 1:59 P.M. on the day of the crime he first met defendant at the Homicide Office. Defendant was then under arrest.[1] After advising him of his *Miranda* rights, Dove questioned him for five or six hours that afternoon and evening. When defendant persisted in denying any involvement, Dove and Detective Pantano took him to Buffalo General Hospital where Saddler was being treated for the gunshot wound, ostensibly to have Saddler identify him. At the hospital the police did not take defendant into Saddler's room, but after having ostensibly spoken with him, they told defendant that Saddler had said he was with

---

1. Dove testified that as of 1:59 P.M. the Street Crime Squad had brought defendant to headquarters and that defendant was then under arrest and in handcuffs. At that point, police already had a statement from Saddler implicating defendant. The felony complaint signed by Dove, however, states that defendant was arrested at 7:00 P.M. at Buffalo General Hospital. In view of all of the circumstances surrounding Dove's initial meeting with defendant at 1:59 P.M., we conclude that at that point defendant was in custody and under arrest (see, generally, *People v Rodney P.,* 21 NY2d 1).

him at the bank. During the afternoon Dove learned that defendant was receiving kidney dialysis treatments.

Dove's first encounter with defendant's father was a one-half hour conversation at headquarters, shortly after Dove's and defendant's return from the hospital, in which, among other things, the father mentioned defendant's physical condition and, according to Dove, that he wanted defendant to cooperate with the police. During the early evening and under further questioning, defendant told the police that Saddler had remarked that morning that he wanted to rob a bank. Later that evening at about 8:00 P.M. two FBI agents interrogated defendant and again defendant denied involvement but admitted seeing Saddler that morning. Dove filled out the felony complaint at 10:35 P.M. on July 19, charging defendant with murder, second degree, and criminal possession of a weapon, second degree. Defendant was fingerprinted at 4:25 A.M. the next morning, July 20.

Detective Sergeant Gorski, who came on duty at 11:00 P.M. on July 19 testified that at about midnight he and his partner Parsons took defendant from his cell and questioned him for approximately two hours. Gorski told defendant that Saddler had implicated him and that there were probably films of the attempted robbery,[2] and defendant responded, "[W]ell, then, you'll see I'm not the person who shot the guard." At the end of the questioning, Gorski said that defendant could contact him again during the night if he wished.

Sometime before 9:00 A.M. on the morning of July 20 defendant asked to speak to the officers who had questioned him the day before. When the officers again began asking him about the attempted holdup, defendant said he first wanted to telephone his father and with Dove's permission he talked with his father twice. During the second call, Dove interrupted and spoke to defendant's father, who, among other things, asked, "What about an attorney?" Dove testified, "I told him it was up to him," by which, he said, he meant it was up to either defendant or his father, but he did not tell defendant that his father had

---

**2.** At trial, Gorski said that when he told defendant there were movies of the attempted robbery he had no idea whether that was true.

inquired about an attorney. When defendant finished talking with his father, he told Dove that he wanted to tell the story but first wanted to speak to the District Attorney.

At about 10:15 A.M. on July 20, Assistant District Attorney Frank Clark met with defendant. After checking with his office, Clark told defendant that he was authorized to offer him a plea to a class C felony in return for his cooperation: specifically "a full and complete and truthful statement from him with respect to everything that he knew, both before, during and after the incident in question * * * [including] any evidence he was aware of that we could use to corroborate statements that he would make * * * [and, if necessary,] his testimony at hearings and the trial of codefendants". During his call to the office, Clark had obtained information about defendant's prior record so that he could discuss accurately the permissible sentences and had learned that defendant was a predicate felon. Based on this information he broached a range of sentences from a minimum of 3 to 6 years and a maximum of 7½ to 15 years. Defendant's main concern, Clark said, was "primarily on what was the most he could receive as a result of a plea". He conceded that it was an "uncommon" procedure for his office to discuss sentences.

Commencing at 10:52 A.M. on July 20, as part of the "deal", defendant gave a videotaped confession filling two tapes and lasting until 12:13 P.M. Chief Leo Donovan of the Homicide Bureau, who conducted the taping, testified that defendant repeatedly yawned deeply, was slow in responding to questions, and spoke in a low voice, but the hesitation, he thought, was not a product of fatigue but of the effort involved in trying to tell the story. At one point in the second tape, however, he asked defendant if he was falling sleep and defendant replied "Yes", although he asserted that he was still "thinking straight".[3]

During the taping, Chief Donovan said, he realized that defendant was not giving "his full cooperation" because he was omitting any involvement of his girlfriend Ethel Ridgeway. Although Donovan thus concluded that the deal

---

**3.** Only the first of the two tapes containing the confession was available for our court's review; the second has been damaged. The record contains a transcript of both tapes.

was off, he did not tell this to defendant but let him complete the taped confession.[4] Following the taping a typewritten statement was prepared which defendant refused to sign. Defendant was arraigned during the afternoon of July 20, 1979 when, apparently, the felony complaint was filed.[5]

According to all prosecution witnesses, neither defendant nor his father made a specific request for counsel at any time. Defendant and his father, however, both testified that they made numerous requests for counsel which were ignored and the officers, defendant said, told him that he could not have a lawyer because if he did, he would not confess. When he arrived at headquarters on the afternoon of July 19, defendant's father said, the police urged him to advise defendant to cooperate and he did so. Again, during the telephone call the next morning, prior to defendant's meeting with the Assistant District Attorney, he was requested to encourage his son to cooperate.

In his testimony, defendant also claimed that police told him he would not be permitted to receive dialysis until he confessed. Defendant was scheduled to be treated on July 19 and received treatment after he was arraigned on July 20. As a result of the delay in treatment, defendant stated, he was "exhausted and sick", "scratching", and falling asleep during the taping and his thoughts were "all confused". His father testified that on July 20 defendant looked "fatigued" and "doped" and Dove stated that during that day defendant grew increasingly tired. While the police were aware that defendant was a dialysis patient, it

---

**4.** Donovan presumably decided that defendant was not telling the whole story at the point where, in describing the flight from the scene of the crime in the getaway car, he omitted the fact that his girlfriend Ethel Ridgeway was driving the car and stated instead that Otis Samuel was the driver. This occurred near the end of the first tape. Thus, Donovan permitted defendant to make the entire second tape despite the fact that he apparently no longer considered the deal to be viable.

At trial, Donovan was asked, "Isn't it a fact that on the nineteenth Mr. Cooper had already been charged with murder and attempted robbery and all that talk with Frank Clark and deal [sic] and pleading to a C felony was completely deceitful to Gregory Cooper?" Donovan replied, "Yes." He denied, however, that the deal was a "ruse" or "trick".

**5.** The felony complaint charging defendant with three counts of murder, second degree (Penal Law, § 125.25, subds 1, 2, 3) and one count of criminal possession of a weapon, second degree (Penal Law, § 265.03) was signed by Dove and dated July 19, 1979 at 10:35 P.M. It bears no court stamp and no indication of when it was filed. The record is silent on this point. For purposes of this appeal we assume that it was filed at the arraignment in the afternoon of July 20, 1979.

is not clear that they knew he needed treatment on July 19 and, according to Dove and Donovan, defendant declined to receive dialysis on July 19.

Dove stated that once a felony complaint is issued and signed, the ordinary practice is to take a defendant for arraignment at the earliest sitting of the court. When questioned concerning why defendant was not arraigned at the morning session of court on July 20, 1979, Dove said that he didn't know whether defendant had yet been fingerprinted and photographed, procedures which are done prior to the arraignment. The delay, he indicated, was also due to defendant's request to talk to the police on the morning of July 20.

The hearing court denied suppression on the basis of findings that defendant's confession was voluntary, that his kidney ailment did not interfere with voluntariness, and that defendant was aware of his rights both from prior experience with the police and from *Miranda* warnings given to him on this occasion. Moreover, the court found that defendant did not request an attorney and that "[h]is father's discussion on the subject with one of the officers was not an actual request for an attorney nor of a nature to require police to stop questioning", and that the father in asking about an attorney was not acting at the direction of defendant.

## II.

After a criminal proceeding has commenced and the matter has passed from the investigatory to the prosecutorial stage, the accused's constitutional right to be represented by counsel at all critical stages of the proceeding attaches (US Const, 6th Amdt, 14th Amdt; NY Const, art I, § 6; see *Kirby v Illinois,* 406 US 682; *People v Settles,* 46 NY2d 154). This is the time "when legal advice is most critically needed" (*People v Settles, supra,* p 164), for it is at this point that the "defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law" (*Kirby v Illinois, supra,* p 689). Once the criminal proceeding has commenced, the accused may not waive his right to legal representation in the absence of his lawyer, and, of

course, because he may not be interrogated by police absent such waiver, any confession given after that time must be excluded (*People v Settles, supra*). In *People v Samuels* (49 NY2d 218, *supra*), the point at which a criminal proceeding commences was established as the filing of the felony complaint or other accusatory instrument (CPL 1.20, subd 17).[6]

In determining whether the criminal proceeding has commenced for purposes of the right to counsel rule, courts have tended not to be rigid or technical in construing CPL 100.05 ("Commencement of action") and CPL 1.20 (subd 17) ("Commencement of criminal action"). Consequently, in pre-*Samuels* cases in which arraignment would have marked commencement of the proceeding and in which statements were taken " 'with the arraignment imminent' " the judicial process was considered to have " 'in effect, begun' " (*People v Lockwood,* 55 AD2d 17, 22 [dissent per Capozzoli, J.], revd on dissenting opn 44 NY2d 769, quoting *People v Richardson,* 25 AD2d 221, 223-224; see, also, *People v Jones,* 87 AD2d 761).

It is not only the formal commencement of a criminal proceeding that gives rise to the right to counsel but, as noted in *People v Samuels* (*supra,* p 221), the right emerges when "there has been significant judicial activity". Thus, for example, court orders permitting the police to bring the defendant to the scene of the crime (*People v Sugden,* 35 NY2d 453, 461) and directing that he appear in a lineup (*People v Coleman,* 43 NY2d 222) have been held sufficient to trigger the critical stage right to counsel. The court has, however, rejected the argument that the right to counsel arises at precommencement proceedings such as corporeal viewings (see *People v Hawkins,* 55 NY2d 474; *People v Blake,* 35 NY2d 331). We find no case holding that plea negotiations with the District Attorney constitute "significant judicial activity" such as would trigger the critical stage right to counsel. Absent any such holding and in view of *Hawkins* and *Blake,* we will assume that they do not, even though such negotiations seem to entail a greater need for legal counsel than the situations involved in *Sugden* and *Coleman.*

---

**6.** The *Samuels* rule applies to cases still on appeal even though the events occurred prior to that decision (see *People v Pepper,* 53 NY2d 213, cert den 454 US 967).

A problem arises when, as here, there has been a warrantless arrest and the accused is held in police custody without the filing of an accusatory instrument, for during this period the accused's right to counsel (US Const, 6th Amdt, 14th Amdt; NY Const, art I, § 6) has not yet arisen by virtue of the proceeding's commencement and although he is in custody he may properly waive his *Miranda* rights and be interrogated by police (US Const, 5th Amdt, 14th Amdt; NY Const, art I, § 6; see *Miranda v Arizona,* 384 US 436). To protect the accused in such a situation, the police, when they make an arrest without a warrant, are bound to bring the accused before a local criminal court and file an appropriate accusatory instrument "without unnecessary delay" (CPL 140.20, subd 1) thus marking the commencement of the criminal proceeding and concomitantly the attachment of the accused's indelible right to counsel (see *People v Samuels, supra*). It is when there has been a violation of that requirement (CPL 140.20, subd 1) that courts have considered the effect of delay on the admissibility of a confession taken during the period of delay.

In *People v Hopkins* (58 NY2d 1079), the court indorsed the general rule that unnecessary delay in arraignment without more does not cause the accused's critical stage right to counsel to attach automatically and that "absent extraordinary circumstances, a delay in arraignment is but a factor to consider on an issue of underlying involuntariness" (*People v Hopkins, supra,* p 1081).[7] In finding that the accused's right to counsel had not attached and that his prearraignment confession was admissible, the court, referring to its decision in *People v Wilson* (56 NY2d 692), distinguished the type of case where unnecessary delay can result in a per se deprivation of the right to counsel. In *Wilson,* the court in holding a prearraignment confession to be admissible observed that "[t]here is nothing to suggest that the short delay in arraignment in this instance was *designed to afford an opportunity for prearraignment*

7. Compare the Federal per se rule, applied in *Mallory v United States* (354 US 449), which held that delay in arraigning the defendant in violation of subdivision (a) of rule 5 of the Federal Rules of Criminal Procedure, which requires the police to arraign an arrested person "without unnecessary delay", renders inadmissible any incriminating statements elicited during such delay. In that case the defendant was arrested at 2:30 P.M. and it was not until 10:00 P.M., shortly after he had confessed, that an attempt was made to take him before a magistrate.

*interrogation or was otherwise calculated to deprive defendant of his right to counsel"* (*People v Wilson, supra,* p 694; emphasis added; see *People v Yanus,* 92 AD2d 674, 675; *People v Lindo,* 85 AD2d 643). From *People v Hopkins* (*supra*) and *People v Wilson* (*supra*), emerges an exception to the general rule, i.e., that if there has been unnecessary delay in filing the accusatory instrument or in arraignment, and the police have caused this delay for the purpose of depriving the defendant of his right to counsel, his critical stage right to counsel will be deemed to have arisen.

Aside from its possible effect in causing an accused's critical stage rights under *Samuels* and *Sugden* (*supra*) to come into play, undue delay in commencing a criminal proceeding may, in combination with other factors, implicate a defendant's rights to due process and protection against self incrimination (US Const, 5th Amdt, 14th Amdt; NY Const, art I, § 6; see *People v Anderson,* 42 NY2d 35, 37-38) because such delay is "one of the many pertinent factors bearing on the question of voluntariness and, therefore, admissibility of a defendant's inculpatory statements" (*People v Dairsaw,* 46 NY2d 739, 740; see *People v Hopkins,* 58 NY2d 1079, *supra; People v Holland,* 48 NY2d 861, *supra*). The voluntariness of a statement is to be determined by examining the "totality of the circumstances" (*People v Anderson, supra,* p 38) from which it arose; and it is settled that the People have the burden of proving that the defendant's " 'will [had not] been overborne and his capacity for self-determination critically impaired' " (*People v Anderson, supra,* p 41, quoting *Culombe v Connecticut,* 367 US 568, 602).

## III.

### A

Undue delay in filing an accusatory instrument, it has been held, is "prima facie a suspect circumstance suggesting that the delay may have been for the purpose of depriving the accused of counsel" and the prosecution has "the burden to explain and offer proof * * * why the opportunity to so have counsel * * * was not afforded" (*People v Blake,* 35 NY2d 331, 340).[8] In deciding whether under the

---

**8.** Although *People v Blake* (35 NY2d 331) involved a corporeal viewing, we see no reason why the same rule would not apply here. In *People v Settles* (46 NY2d 154, 163),

instant circumstances defendant was deprived of his critical stage right to counsel (US Const, 6th Amdt, 14th Amdt; NY Const, art I, § 6) our analysis centers on two questions: was there "unnecessary delay" in filing the accusatory instrument and arraigning defendant (CPL 140.20, subd 1) and, if so, was the purpose of delay to deprive defendant of his right to counsel so that the police could obtain an uncounseled confession (see *People v Wilson,* 56 NY2d 692).

Defendant, it appears from Sergeant Dove's testimony, was arrested and handcuffed sometime prior to 1:59 P.M. on Thursday, July 19, 1979 when Dove first saw him at headquarters. At this point, the police knew of defendant's involvement and unquestionably had sufficient information to constitute probable cause to arrest defendant and hold him for custodial interrogation. No reason is given as to why defendant was not fingerprinted and photographed (see CPL 140.20, subd 1), the complaint filed, and the arraignment held "without unnecessary delay" (CPL 140.20, subd 1) on the afternoon of July 19 while court was still in session as was the usual police practice. The police then had enough information not only to make the arrest but to prepare the felony complaint which Dove filled out and signed that evening. Whether CPL 140.20 (subd 1) would dictate that the felony complaint be filed before the close of court on July 19 we need not decide for it would certainly require filing the next morning, Friday, July 20, at the opening of court. Thus, the delay until the afternoon session of July 20, we find, was "unnecessary delay" (CPL 140.20, subd 1) and a departure from ordinary police procedure.

We turn then to the second consideration: the purpose in delaying commencement of the criminal proceeding until the afternoon of July 20. Since the information had already been prepared, it cannot be contended that the reason for the delay was a need for further information on which to base the charge. Dove assigned two other reasons for the delay. The first was that defendant might not have been

the court stated that "any delay in arraigning an indicted defendant can have no rationale unless done for the purpose of buttressing what at that point is a prima facie case." While *Settles* involved an already indicted defendant, the same rationale would apply here where clearly the police had enough information to support charges against defendant and the felony complaint had already been prepared and signed.

"processed", i.e., fingerprinted and photographed in time for arraignment at the morning session. The proof was, however, that defendant was fingerprinted at 4:25 A.M. on the morning of July 20. Although it does not appear when he was photographed, the police were obligated to process him "without unnecessary delay" (CPL 140.20, subd 1). We conclude, therefore, that the police, who by 9:00 A.M. on July 20 had had defendant in their custody for 17 hours, either had photographed him or should have done so, and that this is not a valid explanation for the delay.

We come, then, to the second reason given by Dove for the delay: that the police wished to permit defendant to negotiate for a plea bargain and give the videotaped confession. This also is unacceptable. If defendant had been arraigned and the felony complaint filed on the morning of July 20, this would not have prevented the police and the District Attorney from making a plea bargain in return for defendant's commitment to give the videotaped statement and evidence against the other defendants. True it is that defendant would have had the benefit of counsel in negotiating the deal — a benefit a defendant would ordinarily have in arriving at a plea arrangement with the District Attorney and a benefit which — in view of subsequent developments (see n 4, p 6) — it appears he needed. Neither the plea negotiations nor defendant's agreed-upon confession, however, would have been prevented. What the delay clearly accomplished was to permit the Assistant District Attorney and the police to conduct their negotiations and the interrogation of defendant in the absence of counsel, something they could not have done if the criminal proceeding had already begun.

The People, however, maintain that although absence of counsel was an inevitable by-product of the delay, it was not the motivating reason. The reason, they say, was to accommodate the request of defendant who announced on Friday morning when he had conferred with his father that he wanted to cooperate and to talk with the Assistant District Attorney about giving a statement. Pointing to *People v Hopkins* (58 NY2d 1079, *supra*), where the court held that defendant's unexpected revelations concerning two unsolved murders constituted sufficient justification

for postponing the originally scheduled arraignment, the People argue that their explanation is enough to meet their burden (see *People v Blake, supra*). *Hopkins,* however, presents a totally different picture. Here, the taped confession was certainly not unexpected. On the contrary, it appears to have been the culmination of the efforts of the police to influence defendant to confess. These efforts included persuading defendant that the case against him was very strong by impressing upon him that his partners in crime had implicated him and that there were probably films of the attempted holdup, enlisting the aid of defendant's father to convince defendant to cooperate, allowing him little or no sleep, and leaving him alone in his cell at approximately 2:00 A.M. with the invitation to call them if he wanted to talk.

*Hopkins* (*supra*) differs in another respect: here, the uncounseled transaction was more than a spontaneous confession; it was a formal plea negotiation between defendant and an Assistant District Attorney who represented to defendant that he was authorized to make a binding commitment. It is true that the Court of Appeals has not held that a plea negotiation is a critical stage in the criminal proceeding giving rise to the *Samuels-Sugden* right to counsel. Nevertheless, as a practical matter, from defendant's point of view, the case by this time had reached the prosecutorial stage when he found himself "faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law" (*Kirby v Illinois,* 406 US 682, 689, *supra*).

█ Dove's second reason for the delay, then, we also find unacceptable. Since no other explanation is offered, we must conclude that the delay was "calculated to deprive defendant of his right to counsel" (*People v Wilson,* 56 NY2d 692, 694, *supra*) and that under the "extraordinary circumstances" (*People v Hopkins, supra,* p 1081) present here, his critical stage right to counsel was violated. The taped confession, therefore, should have been suppressed (*People v Samuels,* 49 NY2d 218, *supra; People v Settles,* 46 NY2d 154, *supra*).

## B

■ The final question is whether, irrespective of defendant's critical stage right to counsel under *People v Samuels* (*supra*), his constitutional rights to due process and to protection against self incrimination were violated (US Const, 5th Amdt, 14th Amdt; NY Const, art I, § 6). Defendant in his brief insists (as he did in his *Huntley* and trial testimony) that he requested the assistance of counsel on several occasions and that his father on his behalf did so also. If defendant had requested counsel, of course, the waiver of his rights (*Miranda v Arizona*, 384 US 436, *supra*) would have been ineffective and any statements made after his request would have been inadmissible (see *People v Cunningham*, 49 NY2d 203). It is not necessary for us to review the hearing court's finding of fact that neither defendant nor his father requested counsel, because we find that defendant's rights were violated on another ground, i.e., that under the totality of the circumstances the People have failed to prove that defendant's " 'will [had not] been overborne and his capacity for self-determination critically impaired' " (*People v Anderson*, 42 NY2d 35, 41, *supra*, quoting *Culombe v Connecticut*, 367 US 568, 602).

The People bear the "heavy burden" of showing a confession to be voluntary beyond a reasonable doubt (*People v Holland*, 48 NY2d 861, 862, *supra; People v Anderson*, *supra*, pp 38-39). We find that the police here engaged in a series of tactics designed to induce defendant to confess, including extensive interrogation (see *People v Anderson*, *supra*, p 39), unnecessary delay in arraignment (see *People v Hopkins*, *supra; People v Holland*, *supra;* CPL 140.20, subd 1) and promises of a reduced plea which were not forthcoming and that these circumstances, combined with defendant's physical condition, were so likely to produce an involuntary confession that the prosecution has failed to carry its burden.

The police detained defendant in custody for approximately 24 hours prior to his arraignment, and, during the first 12 hours subjected him to practically continuous interrogation by members of the Buffalo Police Department and the FBI. During this time they took defendant to the hospital, ostensibly for an identification which was unnecessary and never occurred, and told him that Saddler had

implicated him. They said there were probably films of the crime and persuaded his father to advise defendant to confess. These tactics culminated in Gorski's leaving defendant alone in his cell at 2:00 A.M. with the admonition to call him if he wanted to talk. Not surprisingly, the next morning defendant asked to speak with the officers and indicated a willingness to cooperate in exchange for leniency. While (accepting the suppression court's finding) neither defendant nor his father specifically requested counsel, nevertheless defendant's father expressed a concern that his son have a lawyer by asking Sergeant Dove, "What about an attorney?"

Instead of filing the felony complaint and arraigning defendant which would result in defendant's having an attorney who could negotiate the plea bargain, the police encouraged defendant to engage in the plea bargaining without an attorney — a process clearly requiring legal expertise. Defendant gave the taped confession, believing that it was the first step in carrying out his part of the deal. Police thus obtained his confession, which was used against him at trial; then the prosecutor unilaterally terminated the deal without telling him.

Moreover, defendant's physical condition, including lack of sleep and need for dialysis,[9] may have affected his judgment and will (see *People v Anderson,* 42 NY2d 35, 40, *supra*). Gorski said he questioned defendant from midnight until 2:00 A.M. and defendant was fingerprinted at 4:25 A.M.; defendant claims he was permitted no sleep at all. His dialysis treatment was overdue and, according to Donovan, during the taping he often yawned deeply and at one point in the second tape admitted that he was falling asleep. Defendant testified that he was "exhausted and sick", "scratching", and that his mind was "all confused".

We conclude that irrespective of defendant's critical stage right to counsel, considering the unnecessary delay

---

**9.** Dr. Venuto, a nephrologist and defendant's primary treating physician, testified at trial that defendant's treatment schedule was every Tuesday, Thursday, and Saturday and that he was due for a treatment on Thursday, July 19, 1979. He stated that defendant did not always abide by the schedule and that on one occasion he did not receive dialysis for five days. Symptoms of delay in dialysis include heart failure, severe shortness of breath, lethargy, fatigue, loss of attention, itching of the skin and nausea. Sufferers of renal failure may experience emotional and psychological problems and defendant's "judgment could be impaired" by the condition.

and its effect in depriving defendant of counsel as one factor in the totality of the circumstances (see *People v Hopkins,* 58 NY2d 1079, *supra*), the People have failed to carry their burden of proving that defendant's videotaped confession was voluntary.

The judgment should be reversed and a new trial granted and the motion to suppress the videotaped statement granted.

MOULE, J. (dissenting). Under the facts of this case defendant was neither deprived of his critical stage right to counsel nor coerced into making an involuntary confession.

Defendant was arrested at approximately 2 o'clock on the afternoon of July 19, 1979 in connection with a bank robbery and shooting which had occurred earlier that day. Defendant was immediately advised of his *Miranda* rights and subsequently questioned for five or six hours. Later that evening, at 10:35 P.M., Sergeant Dove filled out a felony complaint charging defendant with second degree murder and criminal possession of a weapon in the second degree. Detective Sergeant Gorski and his partner resumed the questioning of defendant at about midnight. This round of questioning was concluded around 2 o'clock on the morning of July 20, at which time Gorski told defendant that he could contact him during the night if he wished. Sometime prior to 9 o'clock on the morning of the 20th, defendant asked to speak to Gorski. Defendant was then brought to the homicide department to meet with Sergeant Dove and another officer. Defendant stated that he wanted to talk about the homicide and attempted robbery because he was concerned about his family. Defendant requested to first speak with his father and was allowed to do so.

After speaking with his father, defendant met with an Assistant District Attorney who offered him a plea to a class C felony in return for his making a complete and truthful statement about the attempted robbery and his future cooperation with the investigation. Defendant, pursuant to his request, was told the range of sentences that could be imposed for a class C felony. Defendant then agreed to this arrangement and gave a videotaped statement. Taping commenced at 10:52 A.M. and was completed

at 12:13 P.M.[1] Police determined during the course of the taping that defendant was not being truthful because he omitted any reference to the involvement of his girlfriend, Ethel Ridgeway, who police knew was involved in the crime. As a result of his suspected untruthfulness, the offer previously made to defendant was then withdrawn. Defendant was arraigned during the afternoon of July 20. The felony complaint charging defendant with three counts of second degree murder and one count of criminal possession of a weapon in the second degree was also filed at that time.

CPL 140.20 (subd 1) requires that a person arrested without a warrant be arraigned and that an accusatory instrument charging the person with the offenses in question be filed "without unnecessary delay". Failure to comply with this statutory mandate for the purpose of depriving a defendant of his right to counsel requires suppression of any statements taken in violation of this right. The initial question presented is, thus, whether the failure to arraign defendant and file the felony complaint against him until the afternoon of July 20 constitutes "unnecessary delay" under the statute.

This same question was presented in *People v Hopkins* (58 NY2d 1079). In *Hopkins,* defendant was arrested for sexually assaulting a teen-age girl. Approximately one hour prior to his scheduled arraignment on charges stemming from that incident, defendant admitted committing two other unrelated and unsolved crimes. The scheduled arraignment was then changed from 9:00 A.M. to 3:30 P.M. On appeal, defendant argued that delaying the arraignment caused his right to counsel to automatically attach. The Court of Appeals rejected this argument, stating: "[S]uch a delay does not cause the right to counsel to attach automatically. In any event, in the present case, the unexpected revelations concerning the two unsolved murders were more than sufficient justification for postponing the originally scheduled arraignment to a later time" (*People v Hopkins, supra,* p 1081). Similarly, the defendant's request to speak with police along with the subsequent discussion of a plea arrangement with the Assistant District Attorney

---

1. The tape was only 65 minutes long.

and the making of his statement provided sufficient justification for arraigning defendant on the afternoon of the 20th instead of in the morning of that day. The sequence of events occurring on the morning of the 20th, initiated by defendant, was not "calculated to deprive defendant of his right to counsel" (*People v Wilson,* 56 NY2d 692, 694) and the delay in arraignment was not "unnecessary" within the meaning of CPL 140.20 (subd 1). Defendant was, thus, not deprived of his critical stage right to counsel and, hence, his taped statement should not be suppressed on that ground.

Defendant also contends that his statement should be suppressed on the ground that it was involuntarily given. The hearing court denied defendant's motion to suppress his confession on this ground and made the following factual determinations:

"[M]otivated by negotiations to lower the degree of the charges against him in exchange for his cooperation with law enforcement, [defendant] voluntarily confessed. His chronic Kidney ailment, which requires intermittent dialysis, did not interfere with voluntariness.

"It is entirely clear that this most experienced law violator was abundantly aware of his rights both from prior experience with police and from Miranda warnings given to him on this occasion. He did not request an attorney. His father's discussion on the subject with one of the officers was not an actual request for an attorney nor of a nature to require police to stop questioning; nor was the father then acting in the presence of or at the direction of defendant who himself could of course have asked for an attorney if that was his wish."

The hearing court's determination that defendant's confession was voluntary should not be disturbed unless the inferences drawn from the testimony presented at the hearing are not supported by the record (*People v Anthony,* 24 NY2d 696, 702; *People v Baker,* 23 NY2d 307, 319). Considering the totality of the circumstances surrounding defendant's confession (*Clewis v Texas,* 386 US 707; *Fikes v Alabama,* 352 US 191; *People v Anderson,* 42 NY2d 35), particularly his previous experience with police and the criminal justice system and his motivation for cooperating

with the authorities, the hearing court's decision is amply supported by the record and should not be disturbed on appeal.

The cases of *People v Holland* (48 NY2d 861) and *People v Anderson* (*supra*) involved extreme instances of police overreaching and are factually dissimilar from the situation here. In *Anderson,* defendant was placed in an interrogation room and continuously interrogated for 19 hours, not allowed to sleep, not given any food until he was ready to confess, and not even given his *Miranda* warnings until he had been in custody for over 13 hours. In *Holland,* defendant was unjustifiably not arraigned for 48 hours after his arrest,[2] led to believe that he would not be returned to Louisiana to face unrelated charges if he cooperated with police, and dissuaded from contacting counsel by an Assistant District Attorney. Defendant in the instant case was neither coerced nor deceived into making his confession; his intention, as evidenced by his discussions with the Assistant District Attorney over the maximum sentence he could receive for pleading to a class C felony, was to obtain a favorable arrangement for himself. The fact that the offer to plead to the lesser crime was withdrawn as a result of his failure to abide by the terms of the arrangement does not render defendant's confession involuntary, since "[t]here were no absolute assurances given that defendant's co-operation would result in more favorable treatment" (*People v Perry,* 77 AD2d 269, 273).

The judgment should be affirmed.

DOERR and GREEN, JJ., concur with HANCOCK, JR., J. P.; CALLAHAN and MOULE, JJ., dissent and vote to affirm the judgment in an opinion by MOULE, J.

Judgment reversed, on the law and facts, motion to suppress granted, in accordance with opinion, and new trial granted.

---

2. An unnecessary delay in arraignment may, independent of any question regarding defendant's critical stage right to counsel, be considered in determining the voluntariness of a confession (*People v Hopkins, supra*).