OPINION OF THE COURT
Barbara F. Newman, J.
The criminal transactions alleged in the above-referenced indictment involve the shooting deaths of two people. Defendant has been charged with acting in concert in two counts each of murder in the second degree, manslaughter in the first degree, one count of criminal possession of a weapon in the second degree and four counts of criminal possession of a weapon in the third degree. On January 31, 2006, and February 1, 2006, this court conducted a Huntley (People v Huntley, 15 NY2d 72 [1965]) hearing. On February 2, 2006, after hearing testimony, oral argument and considering the law, the court issued an interim written decision and order denying defendant’s motion and indicating that a full written decision with findings of fact and conclusions of law would follow. This is that decision.
Findings of Fact
The court credits the testimony of the two People’s witnesses who testified at the hearing, Detective Nick Cuiffi and Detective Angelo Polite, finding each of them persuasive, frank, open and reliable. Defendant presented no witnesses. Detective Polite is a 12-year veteran of the New York City Police Department (hereinafter NYPD). He is currently assigned to Bronx Nightwatch, where he has been assigned for a year. Prior thereto he was a detective in the 41st Precinct Detective Squad. Detective Cuiffi has been with the NYPD for 2IV2 years and he has been assigned to the Bronx Homicide Task Force for the past four years. On May 27, 2004, while assigned to the 41st Precinct Detective Squad, Detective Polite was assigned to the investigation into the shooting deaths of Louis Fleming and Jason Alston. Consistent with departmental practice, a member of the Bronx Homicide Task Force, in this case Detective Cuiffi, was assigned to assist Detective Polite in the investigation.
During this investigation and prior to June 14, 2004, Detectives Polite and Cuiffi learned that a confidential informant had provided information to Detective Trapani of the Bronx Major Case Narcotics Squad, that the weapon used in the shootings *829 they were investigating was in apartment 2B, at 712 Fox Street, Bronx. Using that information, a search warrant for that premises was secured on June 10, 2004, and executed on the morning of June 15, 2004. Although he was not one of the officers who executed the warrant, Detective Polite learned from officers who were that among the items recovered in the target apartment were a semiautomatic weapon and a silencer. When he arrived at the target apartment after the warrant had been executed, Detective Polite learned that several people, including defendant, who had been inside the apartment when the warrant was executed, had been taken into custody for possession of the aforementioned gun.
Defendant was arrested in the target apartment at 9:45 a.m., on June 15, 2004, and was removed to the 41st Precinct before Detective Polite arrived at the apartment. Detective Polite testified that the arresting officer on the gun case was Detective Trapani and that the felony complaint prepared on the weapons possession charge against defendant bears a notation of June 15, 2004, and a time of 20:20 hours (i.e., 8:20 p.m.) written on it near Detective Trapani’s signature. The felony complaint with these notations was admitted in evidence as defendant’s exhibit B for the hearing. The parties stipulated that Detective Trapani was in the complaint room in the Bronx District Attorney’s office where he signed the complaint at 20:20 hours on June 15, 2004, and then left the complaint room, leaving the signed felony complaint with Assistant District Attorney Dana Roth.
At approximately 8:40 p.m., on June 15, 2004, Detective Polite spoke with defendant in the interview room in the Detective Squad at the 41st Precinct. The interview room is a small cinder block room located off the Detective Squad office with a table and chairs and a one-way mirror. Detective Vincent Miraglia, another member of the Detective Squad, was also present. Detective Polite advised defendant of his constitutional rights by administering the Miranda (Miranda v Arizona, 384 US 436 [1966]) warnings using a preprinted form. The detective advised defendant of the following: his right to remain silent; that anything he said might be used against him in a court of law; his right to an attorney; that counsel would be appointed if he could not afford to retain an attorney; and that he had the right to remain silent until he had the opportunity to consult an attorney. Immediately after advising him of each of these rights Detective Polite asked defendant if he understood and defendant responded that he did. Detective Polite memorialized each *830 of defendant’s responses by writing the word “Yes” next to the corresponding line on the form and asked defendant to initial those responses. Detective Polite then asked defendant if he wished to waive these rights and speak to the police and defendant said that he did wish to do so. Detective Polite wrote “Yes” on the corresponding lines on the form and asked defendant to initial each response and to sign his name at the bottom. Detective Polite then wrote Detective Miraglia’s name and signed his own name at the bottom of the form as well. It is undisputed that for the purposes of the hearing this was the only occasion on which the Miranda warnings were administered to defendant in connection with this case. The rights form was admitted in evidence as part of People’s exhibit 1 for the hearing.
Defendant and Detective Polite had a conversation, which lasted approximately 10 minutes, about the gun which was recovered during the execution of the search warrant. Defendant denied ownership of the gun. At that time Detective Polite did not yet have forensic confirmation whether the gun was used in the shootings of Mr. Fleming and Mr. Alston, so he did not ask defendant any questions about the homicides. Neither Detective Polite nor Detective Miraglia made any threats or promises to defendant. At the conclusion of that conversation, the detectives left defendant in the interview room, where he remained throughout that night and the following day. During that period defendant was given food, drink and opportunities to use the bathroom. Detective Polite intermittently entered the interview room and asked defendant who owned the gun until the detective’s tour of duty ended at approximately 9:00 a.m. on June 16, 2004.
On June 16, 2004, Detective Cuiffi responded to the 41st Precinct after he was notified by fellow officers that the people who had been taken into custody during the execution of the search warrant were there. At 10:30 hours (i.e., 10:30 a.m.), Detective Cuiffi took a written statement from one of those people, Carlos Avila.[1] At approximately 5:35 p.m., Detective Cuiffi introduced himself to defendant and began speaking about the homicides, as opposed to the ownership of the gun recovered during the execution of the search warrant, about which Detec *831 tive Polite had spoken to defendant. Detective Cuiffi testified that it is possible that he confronted defendant with the statement he had taken from Carlos Avila, although he did not specifically recall having done so. Detective Cuiffi interviewed defendant in the same interview room in which defendant had been since the conclusion of his conversation with Detective Polite the night before, about 21 hours earlier. Detective Polite testified that the interview room is more comfortable than the holding pen, and for that reason defendant had not been removed to the holding pen in the interim. Detective Cuiffi testified that he did not administer the Miranda warnings because he knew that they had been administered to defendant the day before by Detective Polite. Defendant made an oral statement and then a statement written in his own hand to Detective Cuiffi. At times while defendant was writing his statement, Detective Cuiffi reminded him of points that he had made in his oral statement. Defendant’s written statement was admitted into evidence and read by the court.
Detective Polite did not recall if he was present at the commencement of the interview of defendant by Detective Cuiffi. While Detective Cuiffi was interviewing defendant, Detective Polite was engaged in other aspects of the investigation. He intermittently entered and then left the interview room in order to continue the investigation, which included speaking with others who had also been arrested in the apartment in which defendant had been arrested. Neither Detective Polite nor Detective Cuiffi made any threats or promises to defendant. Defendant was not handcuffed during the interview. After his conversation with Detective Cuiffi, defendant was taken to Central Booking for processing on his gun case.
On defendant’s motion the court took judicial notice of the “yellow back” court record, which showed that defendant was arraigned on the gun charge on June 17, 2004, during the AR 1 session, which is the day arraignment session which runs from 9:00 a.m. to 5:00 p.m. Further, on defendant’s motion the court took judicial notice of the Criminal Justice Agency prearraignment defendant interview form, which indicates that defendant was interviewed by that agency at 1:15 am. on June 17, 2004.
Conclusions of Law
Defendant now moves to suppress the use at trial of evidence of the oral statement which he made to Detectives Polite and Miraglia on June 15, 2004, and the oral and written statements *832 which he made to Detective Cuiffi on June 16, 2004, at the 41st Precinct on the grounds that they were “involuntarily made” within the meaning of section 60.45 (2) (b) (i) and (ii) of the Criminal Procedure Law, in that all of his statements were taken in violation of his constitutional rights to counsel and silence and against self-incrimination. Specifically, defendant contends that all of the statements which he allegedly made to Detectives Polite, Miraglia and Cuiffi were taken in violation of his right to counsel, which he contends indelibly attached automatically at the time the felony complaint on his gun case was drawn up and signed and could have been filed, and that he had not waived that right in the presence of counsel. Defendant also contends that whether or not his right to counsel had attached, none of the statements were knowingly, intelligently and voluntarily made by him because his ability to choose whether or not to make said statements was overborne by the detectives’ conduct, including the passage of time from when he was arrested on the gun charge to the time and date of the filing of the complaint and of his arraignment thereon.
At a pretrial hearing on a motion to suppress the People’s use of evidence of a statement which the defendant contends was involuntarily made within the meaning of CPL 60.45 (2) (b), the People have the initial burden of going forward. “Once the prosecution has established the legality of the police conduct and the defendant’s waiver of rights, the burden of proof at the suppression hearing shifts to the defendant (see, People v Love, 57 NY2d 998, 999).” (People v Guillery, 267 AD2d 781, 781 [3d Dept 1999]). While the People have established the legality of the police conduct and the waiver of defendant’s rights with respect to all of the statements at issue, defendant has not shown that any of the statements were involuntarily made within the meaning of CPL 60.45 (2) (b). Accordingly, defendant’s motion to suppress the use of his statements to Detectives Polite, Miraglia and Cuiffi is denied in its entirety.
None of the statements at issue were taken in violation of defendant’s right to counsel. The right to counsel indelibly attaches in only two situations: (1) when an uncharged defendant invokes the right by retaining or requesting an attorney in the matter at issue, and (2) automatically when formal judicial proceedings have commenced against a defendant. (See People v Ramos, 99 NY2d 27, 32-33 [2002].) Prior to his conversation with Detectives Polite and Miraglia on June 15, 2004, which was the first occasion on which he spoke with the police concern *833 ing this matter, defendant was advised of his Miranda rights to counsel and silence and serially acknowledged in writing that he understood and waived those rights. He was in continuous custody thereafter until spoken to by Detective Cuiffi. At no time did defendant refuse to speak with the detectives or refuse to answer their questions, or request an attorney.[2] Further, formal judicial proceedings were not commenced against defendant until the felony complaint charging him with possession of a weapon was actually filed and he was arraigned thereon, both of which occurred on the day after the conclusion of his conversation with Detective Cuiffi. Thus, at the time defendant made the statements which he now seeks to suppress he had neither retained nor requested an attorney, nor had formal judicial proceedings commenced.
Defendant’s argument to the contrary notwithstanding, his right to counsel did not indelibly attach simply because a felony complaint had been drawn up and signed and could have been filed prior to the times he made any or all of his statements.[3] Even assuming arguendo that the police deliberately delayed filing the felony complaint and arraigning defendant in order to prolong the period of time during which they could question him, defendant’s right to counsel would not have been triggered thereby. (See People v Ramos, supra; People v Barker, 168 AD2d 211 [1st Dept 1990].) Whether or not law enforcement authorities have a purpose in delaying the commencement of formal judicial proceedings is irrelevant to the determination of whether and when the right to counsel has indelibly attached. *834 (See People v Ramos, supra.)[4] “Rather, such a delay bears on the voluntariness of the [statements], and is a factor to be considered in that regard . . . [I]f law enforcement officials deliberately delay the arraignment to procure a [statement], that fact has a substantial bearing on a claim of voluntariness.” (Id. at 34 [citations omitted].)
In any event, the court finds there was no evidence that the police deliberately delayed the commencement of formal judicial proceedings here to effectuate uncounselled interrogation. The passage of time owed to the ongoing investigation of this double homicide, during which the police were, among other things, awaiting forensic confirmation that the gun they had recovered was the murder weapon, trying to establish the identity of the gun’s owner and interviewing several persons who had been arrested in the apartment in which the gun had been recovered, at least one of whom, in addition to defendant, they suspected may have been involved in the shootings. Under these circumstances, the delay of 32 hours from defendant’s arrest until his conversation with Detective Cuiffi was neither so extraordinary nor excessive as to render involuntary any of the statements taken from defendant in the interim.[5] (See e.g., People v Curry, 287 AD2d at 253 [32-hour delay not excessive “given the extensive, rapidly expanding police investigation involving multiple shootings, defendants and witnesses”] [citations omitted]; People v Haywood, 280 AD2d 282, 282 [1st Dept 2001] [20-hour delay “not extraordinary”]; People v Barker, 168 AD2d at 212 [delay of 16 hours “was justified in light of the ongoing investigation”].) Of course, the length of time from the conclusion of defendant’s statement to Detective Cuiffi on June 16, *835 2004 until his arraignment the next day had absolutely no bearing on the voluntariness of any of his statements. (See People v Vargas, 7 NY2d 555, 566 [1960]; People v Haywood, 280 AD2d at 282.)
Further, the court finds that none of the statements was otherwise involuntary. There is no evidence that defendant was promised anything or subjected to the use or threatened use of physical force, or mental coercion, or that his ability to choose whether or not to make a statement to the police was otherwise impaired in any way. Defendant was not handcuffed or physically restrained at either of the interviews during which he made his statements. There is no evidence that defendant was at any time denied food, drink or the opportunity to use the men’s room if he desired. At no time did defendant refuse to speak with the detectives or to answer their questions. In sum, considering all of the circumstances in which defendant made the statements at issue, the People have established that defendant knowingly, intelligently and voluntarily waived his rights and agreed to make said statements, but defendant has failed to satisfy his burden to show that either his decision to waive his constitutional rights or his decision to make any of the statements was involuntary. (See People v Guillery, supra.)
Accordingly, for all of the foregoing reasons, defendant’s motion to suppress the use at trial of evidence of oral and written statements, which he allegedly made to Detectives Polite, Miraglia and Cuiffi, is denied.

. The parties stipulated that in addition to the statement taken by Detective Cuiffi, Detective Polite took written statements from Carlos Avila at 15:30 hours (i.e., 3:30 P.M.) and at 17:00 hours (i.e., 5:00 P.M.) on June 15, 2004, and that another statement, which was neither dated nor timed, was also taken from Carlos Avila.

. Consequently, there was no need for the readministration of the Miranda warnings to defendant before or during his conversation with Detective Cuiffi on June 16, 2004. (Compare, e.g., People v Curry, 287 AD2d 252, 253 [1st Dept 2001] [although defendant “invoked his right to cut off questioning . . . The police were not precluded from obtaining a statement from defendant many hours later following the administration of a new set of Miranda warnings” [citation omitted]; People v Dow, 129 AD2d 535 [1st Dept 1987] [statement suppressed because police failed to readminister Miranda warnings prior to second interview after defendant had terminated initial interview by invoking his right to remain silent].)

. Defendant’s reliance upon People v Cooper (101 AD2d 1 [4th Dept 1984]) is patently unavailing. Not only is the holding in Cooper, a decision from the Appellate Division, Fourth Department, contrary to precedent in the First Department (see e.g., People v Barker, 168 AD2d 211 [1990]), but it was expressly abrogated by the Court of Appeals in Ramos (see 99 NY2d at 37 n 11).

. “[W]e have never held that a deliberate delay of arraignment for the purpose of obtaining a confession triggers the State constitutional right to counsel . . . [and] we [now] hold that a delay in arraignment for the purpose of further police questioning does not establish a deprivation of the State constitutional right to counsel.” (99 NY2d at 34, 37.)

. Defendant’s reliance on People ex rel. Maxian v Brown (77 NY2d 422 [1991]), which held that a delay of more than 24 hours was presumptively unnecessary and in violation of the statutory prescription that a defendant arrested without a warrant must be arraigned “without unnecessary delay” (CPL 140.20 [1]), is inapposite. As the Court of Appeals stated in Ramos, “CPL 140.20 ... is not meant to ensure the right to counsel.” (99 NY2d at 36.) Nor does the fact that a delay was “unnecessary” for arraignment purposes mean that any statement which a defendant made during such delay was presumptively involuntary. (See People v Holland, 48 NY2d 861, 862-863 [1979] [“unwarranted (prearraignment) delay (of 48 hours), although a suspect circumstance, is but one factor to be considered in assessing the voluntariness of a confession”] [citation omitted].)