THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ETHEL MAE RIDGEWAY, Appellant.

Fourth Department, May 25, 1984

556

APPEARANCES OF COUNSEL

*Rose H. Sconiers* (*Richard Weisbeck* of counsel), for appellant.

*Richard J. Arcara, District Attorney* (*Barbara Eberl* of counsel), for respondent.

OPINION OF THE COURT

HANCOCK, JR., J. P.

■ Defendant seeks reversal of her conviction for felony murder upon, among others, the following grounds: (1) that her confession was inadmissible because given after her critical stage right to counsel had attached by virtue of the issuance of a Federal arrest warrant; (2) that her confession was involuntary and obtained in violation of her *Miranda* rights; and (3) that the introduction of a codefendant's confession violated her right to confrontation (see *Bruton v United States,* 391 US 123). We find no basis for reversal in these or other arguments advanced and accordingly affirm.

I

Defendant, her boyfriend Gregory Cooper, Otis Samuel and Arthur Saddler were tried jointly on charges arising from an attempted holdup of a branch of the M & T Bank in Buffalo, during which a bank guard was killed. Ronald Amerson, also charged with participation in the crime, pleaded guilty and testified for the prosecution against the other four. Video taped confessions given by Cooper and Samuel and a written confession by defendant were admitted into evidence. All four were convicted of murder, second degree, and, except for defendant, of lesser crimes as well (see *People v Cooper,* 101 AD2d 1; *People v Amerson,* 91 AD2d 1204).

The evidence at trial was that on the morning of July 19, 1979, the four defendants and Amerson left defendant's brother's house in a taxicab driven by defendant. At about 10:00 A.M., she parked the cab by a playground near the M & T Bank on Fillmore Street and waited with the engine running while the others entered the bank. Samuel and Saddler were armed. During the attempt to disarm the bank guard, both the guard and Samuel fired their weapons. The guard was killed and Saddler injured so severely

that when the others ran out of the bank, he was unable to follow. Amerson, Samuel and Cooper ran to the waiting taxicab and defendant drove them back to her brother's house.

The evidence at the *Huntley* hearing given by an FBI agent and Buffalo police officers is as follows. FBI Agent Naum arrested defendant at 7:01 P.M. on July 20 pursuant to a Federal arrest warrant at her brother's home. After conducting a search of the residence and giving her *Miranda* warnings, which she said she understood, Naum and other agents took her to FBI headquarters at 7:51 P.M. Shortly thereafter Detective Ludtka of the Buffalo Police Department arrived. He was present as she was again advised of her rights. Although defendant refused to sign the waiver of rights form she said that she understood her rights and was willing to talk. After processing her, the FBI agents conducted defendant to the Buffalo police headquarters shortly after 9:00 P.M. where they turned her over to the Buffalo police.

At police headquarters, Detective Ludtka showed defendant mug shots of Cooper, Samuel, and Amerson. She identified Cooper, saying only that she knew him, and denied any participation in the attempted holdup. At about 10:00 P.M. Detective Gorski arrived. Under continued questioning by Gorski and Ludtka defendant persisted in denying involvement. She was booked and placed in a cell. Ludtka prepared a felony complaint at about 11:00 P.M. accusing her of murder, second degree, and criminal possession of a weapon, second degree. To Gorski's and Ludtka's knowledge, no one questioned defendant from 11:00 P.M. on July 20 until 2:30 A.M. on July 21 when Gorski told her that Samuel as well as Cooper and Saddler had said she was involved. She then admitted participation in the crime and, at about 4:25 A.M., after further questioning, she initialed a waiver of rights card and gave a signed confession. Later that day, on July 21, she was arraigned.

The testimony of the police was that defendant was not threatened or coerced into confessing, that she never requested an attorney and that she did not appear to be intoxicated. Defendant testified, however, that when she was arrested at 7:00 P.M. on July 20, she was intoxicated

and "sluggish" and that at the FBI office in response to the question whether she wanted counsel she gave the name of a lawyer who was never contacted. At Buffalo police headquarters, according to defendant, after she was permitted to telephone her father, the police questioned her for 30 or 40 minutes and then left her in a cell; and a short time later they took her back for prolonged questioning which they interrupted four or five times during the evening by placing her in a cell for brief intervals. Further, she testified that at different points during the questioning they showed her mug shots of the other suspects, told her that Samuel had confessed, that the guard had died, and that Saddler was dying, and threatened that if she "didn't say what [they] wanted to hear, [she] would never see [her] children again." And they brought Amerson to the door of the office where she could see him and showed her the gun they had seized and the pants Samuel had been wearing during the crime. She then admitted that sometime the previous morning she had seen Samuel hand her brother a gun which had blood on the handle. She said someone then typed up a statement and read it to her, telling her that it contained information given by Cooper and Saddler. They then asked her to initial the statement to show that they had read it to her. The only time she was given *Miranda*  ·
warnings was, she stated, at the FBI office.

The hearing court in denying the suppression motion found that defendant's statements "were not involuntarily made [or] made in violation of any constitutional right of defendant". Defendant's motion for a separate trial was denied and during the trial her typewritten statement and Samuel's complete video taped confession were admitted after the court denied defendant's request that portions of Samuel's statement be redacted. Neither defendant nor Samuel took the stand.

Defendant in her confession admitted to driving Samuel, Saddler, Amerson and Cooper in the cab to a corner near the bank, waiting with the engine running while they entered the bank, and then, when all but Saddler returned, driving them back to her brother's house. On the preceding night, she said, she had driven the four men "to the bank and Satch [Saddler] and Gregory [Cooper] got out[.] [A]fter

he came back he asked me to drive for them tomorrow." She was asked: "Did you know why he wanted you to drive?" and answered: "I assumed already that they were going to hold up the bank." In her statement, she also admitted that for her part in driving the cab she expected to receive some of the stolen money and that the police showed her a gun which she admitted seeing in Amerson's possession on the morning of the crime.

The portion of Samuel's video taped confession about which defendant complains is: "Q. Turning your mind over to the bank [robbery], was it discussed who was going to do what and was this done in front of 'Teen' [defendant]? A. Yes, it was. Q. And she had full knowledge of this robbery that was going to go down of the M & T Bank at Fillmore and Box on the nineteenth? A. Yes." In relating the group's plans for the robbery, Samuel said that he was to disarm the bank guard, but he said nothing concerning whether anyone intended to carry a weapon, loaded or unloaded. When it admitted Samuel's confession into evidence, the court cautioned the jury to consider it against him alone, and in its charge, it gave similar limiting instructions. The court also submitted to the jury the questions whether defendant's statement was involuntary and whether it was obtained in violation of her *Miranda* rights.

Defendant raised the affirmative defense to felony murder that she did not commit or solicit the killing, was not armed, and had no reason to believe that any other participant in the crime was armed with a deadly weapon or intended to engage in conduct likely to result in death or serious physical injury (Penal Law, § 125.25, subd 3). She was convicted of felony murder (Penal Law, § 125.25, subd 3) and sentenced to 20 years to life.

## II

■ Under New York law, the "critical stage" right to counsel arises upon formal commencement of a criminal proceeding by the filing of the felony complaint or other accusatory instrument (see CPL 1.20, subd 17; 100.05; *People v Samuels,* 49 NY2d 218; *People v Settles,* 46 NY2d 154) or earlier where there has been "significant judicial activity" (see, e.g., *People v Coleman,* 43 NY2d 222). Here, since no accusatory instrument had been filed in any State

court,[1] the New York criminal proceeding had not been commenced. Nor had there been any judicial activity in New York.[2]

Nevertheless, defendant argues that, although at the time she waived her rights and confessed there had been no commencement of any State criminal action against her, the filing of the complaint and issuance of the arrest warrant in Federal court should be given effect as though they had occurred in State court for the purpose of generating her New York "critical stage" right to counsel under *People v Samuels* (*supra*) and *People v Settles* (*supra*) and that her subsequent confession should be suppressed. She points out that had these acts occurred in State court, they would under New York law have marked the commencement of the criminal proceeding (see CPL 120.10, subd 1; *People v Samuels, supra*). We reject this argument.

The purpose of the "critical stage" right to counsel rule is to afford legal assistance to a defendant at all critical stages of a specific criminal proceeding, when he "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law" (*Kirby v Illinois*, 406 US 682, 689, cited in *People v Settles, supra*, p 163; see *United States v Cronic*, __ US __, 52 USLW 4560). As distinguished from

1. In her appeal, defendant contends for the first time that her *Samuels-Settles* critical stage right to counsel attached sometime before midnight on July 20, 1979 and prior to her confession which was given in the early morning hours of July 21. The contention is based on a typewritten notation in a form in the clerk's file stating: "Acc Inst Filed 7.20.79". Since defendant was not arrested until 7:00 P.M. on July 20 and the felony complaint was not prepared until 11:03 P.M. that night, defendant's contention must necessarily be that the complaint was filed in city court (pursuant to CPL 1.20, subd 17; 100.05) in the 57 minutes remaining until midnight on July 20, a period during which, under the rules, city court is not open (see 22 NYCRR 3420.1 [b]). In view of defendant's failure to raise the issue and the lack of any proof that city court was open during the period, the contention on its face appears spurious. In any event the newly advanced contention based on the form was not preserved for appellate review (see CPL 470.05). The document was never offered in evidence, made part of the record, or referred to in the suppression hearing, at trial or at any time "when the People would have an evidentiary opportunity to counter [the] assertion" (*People v Tutt*, 38 NY2d 1011, 1013; *People v Kinchen*, 60 NY2d 772; see *People v Martin*, 50 NY2d 1029; *People v Jones*, 81 AD2d 22, 32-42).

2. The court in *People v Samuels* (49 NY2d 218, 221) noted that the "critical stage" right to counsel may arise even prior to the formal commencement of the proceeding where there has been "significant judicial activity" such as a court order directing defendant to appear in a lineup (see *People v Coleman*, 43 NY2d 222). In the instant case not only had the New York criminal proceeding not commenced, but there is no claim or evidence of other New York judicial activity. The only point we address concerns the effect of the Federal arrest warrants.

the right to counsel in the investigatory stage (see *People v Cunningham,* 49 NY2d 203; *People v Hobson,* 39 NY2d 479) which depends upon the physical fact of the accused's custody and protects him against self incrimination when he feels "that he is not competent to deal with the authorities without legal advice" (*Michigan v Mosley,* 423 US 96, 110, n 2 [White, J., concurring], quoted in *People v Cunningham, supra,* p 209), the New York *Samuels-Settles* "critical stage" right (see US Const, 6th Amdt, 14th Amdt; NY Const, art I, § 6; *People v Hawkins,* 55 NY2d 474) arises in the prosecutorial stage from the procedural fact of the commencement of the criminal proceeding. The right is peculiar to and dependent upon the existence of the particular proceeding. Until there is a criminal prosecution (or significant judicial activity) in which the defendant is entitled to the protection of counsel, there is no need for the protection and no purpose for the rule and the critical stage right simply does not exist. Here, because, at the time of defendant's confession, the New York prosecution had not commenced, there was no vehicle in which her *Samuels-Settles* "critical stage" right (US Const, 6th Amdt, 14th Amdt; NY Const, art I, § 6) could arise. Contrary to defendant's view, for purposes of the *Samuels-Settles* right to counsel, what may have occurred in instituting the prosecution for the Federal offense is irrelevant since the Federal activity could not create a critical stage right to counsel in a State criminal proceeding which had not yet come into existence.[3] Defendant cites, and we have found, no authority for her position, and we discern no legal or policy reason for adopting it.

## III

Defendant maintains that all of the questioning by the FBI and the Buffalo police prior to her confession was illegal and that since the confession was the product of that questioning it must be suppressed. The questioning was improper, the argument goes, because at the time the FBI gave her *Miranda* warnings she refused to waive her right

---

**3.** ▪ Under Federal law, the filing of a complaint and issuance of an arrest warrant have been held not to constitute commencement of formal criminal proceedings (see *United States v Duvall,* 537 F2d 15 [CA2d, 1976], cert den 426 US 950; see, generally, *Brewer v Williams,* 430 US 387; *Kirby v Illinois,* 406 US 682). Thus, the Federal court acts here did not trigger defendant's "critical stage" right to counsel under Federal law.

to remain silent; thus further interrogation was impermissible without a reiteration of the warnings (see, generally, *People v Buxton,* 44 NY2d 33, 37), something which was not done until immediately before she gave her signed statement. The argument rests on the premise that defendant did not knowingly and voluntarily waive her rights at FBI headquarters, a premise rejected by the hearing court and the jury.

Defendant concedes that she received her *Miranda* warnings at the FBI office and the testimony of the FBI agent is uncontradicted that although she declined to sign the waiver form, she stated that she understood her rights and was willing to talk. She argues, however, that she should be deemed to have asserted her right to remain silent at that point based on her refusal to sign the waiver form and her persistence in maintaining her innocence. It is well established that a defendant may effectively waive his right to remain silent by orally agreeing to talk although he refuses to sign a written waiver (see *North Carolina v Butler,* 441 US 369, 373; *People v Davis,* 55 NY2d 731). And the fact that defendant repeatedly gave exculpatory versions of events does not show her desire to remain silent but rather a decision to try to exonerate herself by giving false information to the police.

There is, moreover, abundant support in the record for the hearing court's and the jury's determinations that defendant knowingly, voluntarily, and effectively waived her *Miranda* rights at FBI headquarters (see, generally, *People v Davis, supra; People v Johnson,* 49 AD2d 663, 664-665, affd 40 NY2d 882). Thus, once defendant stated at FBI headquarters that she was willing to talk, subsequent questioning without repetition of her *Miranda* rights was proper (see *People v Crosby,* 91 AD2d 20, 29; *People v Johnson, supra;* see, generally, *Gorman v United States,* 380 F2d 158, 164; cf. *People v Buxton, supra*).

Nor is there any basis for defendant's claim that under the "totality of the circumstances" (see *People v Anderson,* 42 NY2d 35, 37-38) her confession was involuntary (see CPL 60.45). The hearing court found the confession to be voluntary as did the jury. Indeed, there was no claim by defendant in the suppression hearing that her confession

was the product of police pressure.[4] The circumstances here, where defendant had no physical infirmity, was not subjected to extensive interrogation, and was in custody for 9½ hours prior to confessing, are distinguishable from those in *People v Cooper* (101 AD2d 1, *supra*) in which we found that the physical condition of the defendant (who was in need of kidney dialysis) and the actions of the police in keeping defendant incarcerated without sleep and under lengthy intermittent interrogation for about 24 hours, in persuading defendant's father to urge defendant to confess, and in delaying his arraignment to permit the unrepresented defendant to bargain with the District Attorney's office all culminated in an involuntary confession. We conclude that here the People have carried their burden of proving that defendant's " 'will [had not] been overborne [or her] capacity for self-determination critically impaired' " (*People v Anderson, supra,* p 41, quoting *Culombe v Connecticut,* 367 US 568, 602).

## IV

■ Defendant's *Bruton* argument is that she was prejudiced by the admission of Otis Samuel's video taped confession because it conflicted with her own on the question, crucial to her affirmative defense, of whether she had knowledge that the weapons would be loaded. The general rule established in *Bruton v United States* (391 US 123, *supra*) is that "when introduction in evidence of the extrajudicial confession of a codefendant not testifying and not subject to cross-examination adds substantial weight to the prosecution's case against [a] defendant, that defendant is denied his constitutional right to confrontation" (*People v Safian,* 46 NY2d 181, 187); even the use of limiting instructions may not ameliorate the prejudice (see *People v Safian, supra,* p 187). An exception to the rule governs "when the implicated defendant himself has made a confession close enough to the one offered against him to make the probability of prejudice so 'negligible' that in the end

---

4. On the contrary, her only contention at the *Huntley* hearing was that she signed the typewritten statement after police told her it was a composite of information given by Cooper and Saddler, read it to her, and then directed her to sign it as proof only that they had read it to her. This claim is refuted by the form and the content of the statement itself which is a sworn affidavit by defendant and by testimony of the police which the court and jury accepted.

'the result would need to be the same'" (*People v Berzups,* 49 NY2d 417, 425, citing *People v Safian, supra,* pp 188 [majority opn], 194 [dissenting opn citing *People v Fisher,* 249 NY 419, 426]). The issue here is whether defendant's confession is sufficiently similar to Samuel's so that the exception would apply. We find that it is.

At the outset, it must be emphasized that defendant's argument that the statements are inconsistent on the incriminating point of her knowledge that the guns were loaded does not depend on any dissimilarities in the actual content of the statements; for neither says anything on this subject. Her argument necessarily depends upon the inference (which the jury would presumably draw from Samuel's statement that defendant "had full knowledge of this robbery that was going to go down") that she was specifically aware that the bank robbers intended to carry loaded weapons. While it is, of course, possible that the jury would reach this conclusion, it would seem equally likely, if they thought about it all, that they would assume that the specific detail of whether the guns were loaded was not discussed. The jury could also with equal likelihood have concluded from defendant's own statement (that on the night before the crime she had driven the four men to the bank and that when they asked her "to drive for them tomorrow" she "assumed already that they were going to hold up the bank") that she learned that her accomplices intended to use loaded guns in the holdup. Given the facts that the prosecution in its summation pertaining to defendant did not refer to Samuel's statement and that the trial court gave proper limiting instructions in its charge, we find the admission of Samuel's full statement to have been "of no measurable consequence in the face of the overwhelming and largely uncontroverted evidence contained in the interlocking confession of the defendant [herself]" (*People v Berzups, supra,* p 425; cf. *People v Smalls,* 55 NY2d 407, in which defendant, in his confession only admitted being present at the scene while the codefendant's statement implicated defendant as a knowing participant in the crime).

In any event, we find that the proof against defendant arising from her own confession and from Amerson's testimony was so strong that, even if both the severance and

redaction requests should not have been denied, " 'there is no reasonable possibility that the error might have contributed to defendant's conviction and * * * it was thus harmless beyond a reasonable doubt' " (*People v Rivera,* 57 NY2d 453, 456; *People v Crimmins,* 36 NY2d 230, 237).

We have examined the other points raised on appeal and find them to be without merit.

To the extent necessary to our holding herein, we have made such findings as the trial court could have made and as were warranted by the evidence (see CPL 470.15, subd 1; *People v Casado,* 83 AD2d 385; *People v Brown,* 33 AD2d 735).

The judgment should be affirmed.

GREEN, J. (dissenting). I cannot subscribe to the view, stated in point II of the opinion, that what occurred in the Federal prosecution was "irrelevant" to ascertaining whether defendant's critical stage right to counsel attached, nor can I accept the majority's assertion in point III that defendant's alleged waiver of her rights at FBI headquarters justified further interrogation by the Buffalo police without a reiteration of the *Miranda* warnings. The majority cannot have it both ways — if what the Federal officials did was truly "irrelevant", then it should not be considered in either instance. Here, however, the Federal prosecution could not be more relevant to the issues presented.

It is well settled that a defendant is entitled to counsel at all critical stages of a criminal prosecution (*People v Settles,* 46 NY2d 154, 165). The right to counsel may attach once a criminal action is commenced (see, e.g., *People v Blake,* 35 NY2d 331, 339-340) or earlier, if there has been "significant judicial activity" (see, e.g., *People v Coleman,* 43 NY2d 222 [court order directing defendant to appear in a lineup]; *People v Sugden,* 35 NY2d 453, 461 [court order permitting the police to bring defendant to the scene of the crime]). The majority deems the judicial activity of Federal District Court Judge Curtin in issuing the arrest warrant not only insignificant, but "irrelevant since the Federal activity could not create a critical stage right to counsel in a State criminal proceeding which had not yet come into existence." The majority, however, cites no authority for its

view that in order for judicial activity to be significant it must arise in a State rather than in a Federal court. Moreover, our courts have not hesitated to extend the protections afforded by our State Constitution beyond those of the Federal Constitution (see *People v Settles, supra,* p 161).

The issuance of the Federal warrant for defendant's arrest based upon a reasoned determination by an experienced Federal District Court Judge that there was probable cause to believe that defendant had participated in a crime is, in my judgment, functionally and procedurally equivalent to the filing of a felony complaint in a State criminal court for purposes of ascertaining whether defendant is at a "critical stage" of a criminal prosecution (see *People v Samuels,* 49 NY2d 218, 221).

It was the existence of the Federal complaint and warrant that brought the defendant into the custody of the Buffalo police. Buffalo homicide detectives were present throughout the interrogation of the defendant and, after defendant was transported to the FBI office, she was released to the sole custody of the Buffalo police. When activities of Federal and State or local authorities become so interwoven as to constitute a joint effort, there is a significant potential for abuse of a defendant's *Samuels* right to counsel. For example, a defendant could be held indefinitely by Federal officials pursuant to a Federal warrant so that the local police, not then compelled to arraign the defendant in order to keep her in custody, may use the period to obtain a confession in the absence of counsel (see *Byars v United States,* 273 US 28, 31-33). It is precisely this concern for calculated efforts on the part of law enforcement officials to deprive a defendant of a constitutional right that led this court to reverse a judgment of conviction in a companion case (see *People v Cooper,* 101 AD2d 1), and led the United States Supreme Court to denounce the "silver platter doctrine" a quarter century ago (see *Elkins v United States,* 364 US 206). We have an obligation to scrutinize the facts of every case to prevent constitutional violations by "circuitous and indirect methods" (see *Byars v United States, supra,* at p 32; *Boyd v United States,* 116 US 616, 635). That obligation is not

fulfilled by ignoring the activities of the Federal authorities in this case.

When defendant was arrested pursuant to the Federal warrant, both the FBI agents and the Buffalo police detectives working in unison with them "already knew that a crime had occurred and that defendant was to stand trial therefor. This is precisely the juncture at which legal advice is crucial" (*People v Settles, supra,* at pp 163-164). Surely the issuance of the Federal warrant was sufficiently judicial in nature to permit invocation of defendant's right to counsel and defendant was placed in as vulnerable a position by the warrant as if she had been ordered to appear in a lineup or at the scene of the crime (see *People v Coleman, supra; People v Sugden, supra*). Thus, I would equate the issuance of the Federal arrest warrant based upon probable cause with the entry of a lawyer into the proceedings and invoke the requirement of counsel's presence to effectuate a valid waiver (*People v Settles, supra,* at p 166).

Assuming that defendant's right to counsel did not attach until the filing of the complaint in a criminal court (CPL 1.20, subd 17), there is support in the record that the accusatory instrument was filed on July 20, 1979, the date typed on the felony complaint. The time the complaint was prepared, or the hours the City Court of Buffalo is open and closed is irrelevant. Since the police did not obtain defendant's statement until the early morning hours of July 21, 1979, the confession should be suppressed (*People v Samuels, supra*).

Moreover, the conduct of the Federal and local authorities, as well as defendant's behavior during the 9½ hours she was in the custody of the Buffalo police, indicates that she did not knowingly and voluntarily waive her *Miranda* rights. During this time the defendant was booked, taken to a cell, questioned by at least two police detectives and two FBI agents and then taken back to her cell. This process of intermittent questioning was repeated at least four or five times. Defendant indicated that the procedure was tiring and that she wanted to sleep. She was shown photographs of the other alleged suspects and told that

they had admitted participation in the murder when, in fact, her boyfriend, Gregory Cooper, had not implicated her at all.

The majority reasons that because defendant was given her rights by the FBI agents at 7:00 P.M. and did not remain silent during the next 9½ hours, she waived her rights. This is curious logic given the majority's prior claim that what the Federal officials did was irrelevant and the fact that, throughout this period of interrogation, the defendant consistently denied involvement in the crime despite being misled by the police. Had defendant remained silent, she could not have waived her rights without signing the waiver form. The fact that she choose to respond to 9½ hours of intermittent questioning only to exculpate herself cannot, in my judgment, be viewed as a voluntary waiver of her rights absent the presence of counsel (see *Michigan v Mosley*, 423 US 96; *Westover v United States*, 384 US 436; *People v Buxton*, 44 NY2d 33).

The judgment should be reversed and a new trial granted, and the motion to suppress the confession granted.

DENMAN and MOULE, JJ., concur with HANCOCK, JR., J. P.; DOERR and GREEN, JJ., dissent and vote to reverse the judgment, grant a new trial and suppress the confession in a separate opinion by GREEN, J.

Judgment affirmed.