OPINION OF THE COURT
Mary McGowan Davis, J.
Defendant Owen Rice has been indicted for the crimes of scheme to defraud in the first degree (Penal Law § 190.65 [1] [b]); grand larceny in the second degree (Penal Law § 155.40 [1]); and violation of General Business Law § 352-c (6). The indictment alleges that in 1992, defendant and his codefendants, Ralph Scheri and Leonard Gruber,[1] stole money held in trust for the people of Nauru by representing that they had invested Nauru’s money in certain financial instruments, which the People claim are fraudulent, and by taking unauthorized commissions on the purported transaction. In his pretrial motion papers, defendant sought to suppress tape-recorded statements made on March 5, 1993 during a phone call between himself and Glenn Tobias, an alleged accomplice turned cooperating witness. In my January 23, 1997 decision on the sufficiency of the Grand Jury presentation and other pretrial matters, I ordered a Huntley hearing to determine whether defendant’s statements were obtained in violation of his right to counsel, or were otherwise involuntarily made.
I conducted a Huntley hearing on September 15, 16, 18, 22 and October 1, 1997. For the reasons set forth below, on October 7, 1997, I granted defendant’s suppression motion, concluding that statements he made during the March 5, 1993 taped phone call with Glenn Tobias were obtained in violation of his right to counsel. In reaching this decision, I credited the testimony of all the witnesses. The essential facts disclosed at the hearing are not in dispute.
FINDINGS OF FACT
In the latter part of 1992 and during the beginning of 1993, the Office of the United States Attorney for the Southern District of New York was inquiring into allegations that substantial sums of money had been stolen from the Nauru Phosphate Royalties Trust, which fund was established to ben *753 efit the citizens of the Republic of Nauru. In connection with this criminal investigation, in February 1993, Thomas Doonan, an investigator for the United States Attorney’s Office, served Glenn Tobias, a resident of California, with a Grand Jury subpoena. Although Tobias did not ultimately testify before a Federal Grand Jury, he took part in approximately four debriefings with Federal prosecutors and investigators in the Southern District during the latter part of February and March 1993.
After one such debriefing on March 5, 1993, at the request of the United States Attorney’s Office and under the direction of Investigator Doonan, Tobias telephoned defendant Owen Rice, an attorney residing in Florida. Doonan recorded this call in the presence of Richard Marmaro, Tobias’ attorney at the time, Assistant United States Attorneys (hereinafter AUSA) Howard Heiss and Dan Nardello, and FBI Agent Jack Hess. The Federal authorities proposed making this call to Rice in Florida in an attempt to obtain information on past allegedly criminal activities involving the disappearance of Nauru’s money and to gather information respecting what they believed to be ongoing criminal behavior in connection with the solicitation of so-called “prime bank notes” and “standby letters of credit”. A review of the transcript of the taped conversation between To-bias and Owen Rice reveals that both past and ongoing activities were discussed during the call.
At the same time that the Federal Government was investigating the Nauru matter, a civil litigation — initiated to recover Nauru’s allegedly stolen money — was underway in the High Court of Justice in London. As part of this civil action, both Rice and Tobias were subpoenaed to give testimony in late December 1992. Shortly thereafter, Tobias talked with Rice about obtaining legal representation. Tobias learned that Rice had retained Edward Adkins, Esq., a member of the Florida Bar, to represent him in connection with the London litigation. Tobias could not specifically recall how Rice described the nature of Mr. Adkins’ representation, but he did remember that Rice spoke of the possible need for a criminal defense attorney in connection with the Nauru matter. Rice also advised Tobias that if Tobias needed a lawyer for his Nauru “trouble”, he should contact Mr. Adkins for a referral. In fact, Tobias did speak with Mr. Adkins and was referred to a lawyer in California who handled both civil and criminal matters.
Thus by March 5, 1993, Tobias admittedly was aware, and had told his attorney Mr. Marmaro six weeks earlier, that Rice *754 had retained a lawyer to represent him in connection with the litigation relating to Nauru and the loss of the Trust’s funds. As of March 5, however, Tobias had not reported to the Federal authorities that Rice was represented by Mr. Adkins. At the time the phone call was taped, neither Investigator Doonan nor Agent Hess was aware that defendant had counsel in a related civil litigation pertaining to Nauru, although they both learned at a debriefing of Tobias several weeks later that Rice had retained counsel to defend that lawsuit. Similarly, AUSA Heiss, who was present at the time the call was recorded, testified that he had no recollection of discussing with Tobias prior to March 5 whether or not Rice had engaged an attorney.
AUSA Heiss indicated that had he known Rice was represented by counsel on the Nauru matter on March 5th, he would have “followed a particular office procedure” requiring preparation of a memo by the AUSA in charge of the case for review by Heiss and other supervisors. Because Rice’s status as a represented person was unknown to him, this procedure was not followed in this instance.
Notwithstanding the recollections of Doonan and Heiss that they were unaware on March 5 that Rice had retained counsel, a recent review by the United States Attorney’s Office and Assistant District Attorney (ADA) Donohue of files in the Southern District revealed that the Federal authorities were actually on notice prior to March 5 that Rice was represented by counsel in the civil litigation in England. ADA Donohue informed the court at the close of the hearing that files in the Southern District contain documents — including pleadings and letters related to the ongoing litigation in England — that make reference to Mr. Adkins as Rice’s attorney-of-record in that matter. These documents were provided to the United States Attorney’s Office, pursuant to subpoena, on February 8, 1993 by Aaron Marcu, an attorney representing one of the parties in the London litigation, who was investigating the disappearance of Nauru’s money. In fact, Agent Hess acknowledged that he was aware before March 5 that Mr. Marcu had provided documents about the lawsuit in England to the Federal authorities, although Hess had not actually read them at that time.
There is no indication that the New York County District Attorney’s office, or any State or local authority, participated in this Federal investigation or was aware of the recording of this phone call at the time it took place. The first contact between Tobias and the District Attorney’s office regarding Nauru issues occurred approximately a year after the taped call.
*755 Subsequent to the Federal inquiry described here, Mr. Morgenthau’s office did initiate its own investigation into the whereabouts of monies assertedly stolen from the Nauru Trust, which resulted in the present criminal indictment. The District Attorney now seeks to introduce into evidence in State court the tape of the telephone conversation between Rice and To-bias that was recorded by the Federal investigators.
CONCLUSIONS OF LAW
This case presents the novel question whether interrogation by Federal authorities, independent of any involvement by New York State officials, of a suspect known to have retained counsel on the specific matter under investigation violates the “indelible” right to counsel guaranteed by the Constitution of the State of New York. Rice argues that because Tobias acted as a Government agent at the time he questioned Rice about events that formed the basis of criminal charges ultimately brought by the State, he is entitled to the benefit of New York’s expansive protection of the right to counsel, which he asserts was violated by Tobias’ conduct. The People effectively concede that had the taped call been instigated or colluded in by State officials, they would not succeed in introducing the evidence at trial. They maintain, however, that since the conduct of the Federal authorities violated no Federal law or policy and preceded the State investigation by more than a year, it did not offend the State Constitution and the tape recording should therefore be admissible. For the reasons that follow, I conclude that under New York law, defendant’s right to counsel was indeed violated by the surreptitious questioning, and that Rice’s statement — obtained by an agent of the Federal Government at a time when the Government was on notice that defendant was represented by counsel in a directly related civil matter — cannot be used at the present State criminal trial.
The right to counsel in New York State has developed independently of the Sixth Amendment and is broader in scope than the right to counsel derived from the Federal Constitution. (See, People v West, 81 NY2d 370, 373 [1993]; People v Davis, 75 NY2d 517, 521 [1990]; see also, People v Burdo, 91 NY2d 146 [1997] [dissenting opn].) In New York, the right to counsel attaches “indelibly” and cannot be waived in the absence of counsel in two situations, namely, (1) upon the commencement of formal proceedings (the so-called “critical stage” right to counsel discussed in the “Di Biasi” line of cases [People v Di Biasi, 7 NY2d 544 (1960)]); and (2) where an uncharged *756 individual has actually retained a lawyer in the matter at issue, or while in custody, has requested a lawyer in that matter (the “investigatory stage” right at issue in the “Hobson” line of cases [People v Hobson, 39 NY2d 479 (1976)]). (People v West, 81 NY2d, at 373-374.) A suspect’s right to counsel is not dependent on his custodial status, as long as he has actually retained an attorney to represent him on the matter about which he is questioned. (People v Skinner, 52 NY2d 24, 30 [1980].) In pressing his State constitutional claim under the Hobson line of cases, Rice maintains that his right to counsel indelibly attached when he retained Mr. Adkins on the Nauru matter, barring any questioning on the subject by governmental authorities in counsel’s absence. (See, People v Skinner, 52 NY2d, at 30.)
A twofold rationale underlies New York’s “indelible” right to counsel under the Hobson line of cases. (People v West, 81 NY2d, supra, at 373-374.) First, recognition of the right to counsel in this context serves to level the playing field and to equalize the balance of power between the individual and the “coercive” force of the State. “Requiring that a person waive the constitutional right to counsel in the presence of an attorney ensures that the person relinquishes the valuable right to the assistance of counsel intelligently and voluntarily, aided by someone acting in his or her interest”. (People v Skinner, 52 NY2d, supra, at 29; People v Hobson, 39 NY2d, supra, at 484-485.) (Indeed, this rationale also supports the right to counsel that attaches upon the commencement of formal proceedings under the Di Biasi line of cases.) Additionally, acknowledgement of the right to counsel, even before an individual is formally charged, makes applicable in the “criminal sphere” (People v Skinner, 52 NY2d, at 30), the ethical responsibility lawyers have in civil actions to refrain from communicating with a represented party on the subject of the representation (see, Code of Professional Responsibility DR 7-104 [A] [1] [22 NYCRR 1200.35 (a) (1)]; see also, ABA Code of Professional Responsibility DR 7-104 [A] [1]), and guards against “undue interference [by an adversary] with any existing attorney-client relationship”. (People v West, 81 NY2d, at 374.) In short, where an individual has actually retained counsel on the matter at issue, the courts in New York recognize that he has activated “his constitutional right to interpose an attorney between himself and the overwhelming power of the State”, and that this relationship should be fostered and respected. (See, People v Skinner, 52 NY2d, at 32.)
*757 Assessing the parties’ contentions in light of the foregoing principles, it bears emphasizing that the following critical facts are not in dispute. When Tobias called defendant on March 5 at the direction of the Federal authorities, defendant had retained counsel to defend him in a pending civil action arising out of the same allegedly criminal transaction that was the subject of the Federal inquiry. Indeed, the People concede that the Federal investigation and the civil action, as well as the present criminal case in New York County, were all generated by the identical conduct, and are thus “related” for purposes of determining the scope of Rice’s right to counsel. Moreover, the Federal authorities were on notice of defendant’s representation by counsel in the Nauru litigation in London at the time of the phone conversation between Tobias and Rice, as they had received the civil action pleadings and letters bearing Rice’s attorney’s name during the course of their investigation.[2] Finally, it is undisputed that Tobias acted at the behest of the United States Attorney’s Office and thus as an agent of the Government when he placed the call to Rice and elicited statements from him about their past conduct together.
Given these uncontested facts, the decision in People v Gold-finger (149 Misc 2d 765 [Sup Ct, NY County 1991] [Andrias, J.]) is instructive. In Goldfinger, the defendant’s statements were surreptitiously taped by an alleged coconspirator who had agreed to cooperate with investigators prior to the initiation of formal criminal proceedings. At the time the statements were recorded, the alleged wrongdoings under investigation by the District Attorneys office were also the subject of a Federal civil lawsuit and the defendant in Goldfinger — like defendant Rice here — had retained counsel to represent her with respect to those civil charges. In defending the actions of the investigators, who questioned defendant in the absence of a waiver of counsel made in counsel’s presence, the People argued that because the State authorities were not in any way involved in *758 the Federal lawsuit, they were not bound by the strictures of New York’s right to counsel rule in conducting their criminal investigation, even though the Federal action concededly concerned similar allegations of wrongdoing.
Justice Andrias rejected the People’s argument, emphasizing that “even if the defendant has not been formally charged and is not in custody, where ‘a defendant is known to have invoked the right to and obtained the services of counsel on the matter about which the person is questioned, the State may not use the statements elicited from that person in the absence of a waiver of counsel made in the presence of the attorney’.” (People v Goldfinger, 149 Misc 2d, supra, at 768-769, quoting People v Skinner, 52 NY2d 24, 32 [1980], supra.) As the court noted, its ruling, like the Court of Appeals decision in Skinner, was based on defendant’s “invocation” of the right to counsel and not on the conduct or motives of the police or prosecutor: “One retains an attorney to protect oneself against charges of wrongdoing, whether they be criminal or civil. The defendant retained counsel to shield her from a civil action initiated by private attorneys: to hold that her retained attorney could not protect her from questions about the very same allegations merely because they were being asked by an agent of Government attorneys in the criminal action would render her right to counsel illusory (to borrow People v Skinner’s term).” (People v Goldfinger, 149 Misc 2d, at 771.)[3]
The rationales identified by Justice Andrias as supporting recognition of the right to counsel in Goldfinger (supra) are clearly implicated in the present case and underlie my conclu *759 sion that defendant’s right to counsel was violated at the time his statements were recorded by prosecutorial authorities in the Southern District, even though no State investigation was contemplated at the time. By retaining Mr. Adkins in or about December 1992 to defend him against the civil action in London, which involved similar allegations about the very transaction that was the subject of the Federal investigation and this prosecution, defendant unequivocally invoked his right to counsel with respect to charges — whether civil or criminal— arising out of his alleged misconduct concerning Nauru’s funds. In a conversation with Tobias after receiving the subpoena, Rice acknowledged the possibility of criminal exposure and his intention to retain a lawyer who could defend against such charges. Furthermore, the Federal law enforcers were on notice of — and were accountable for — information in their possession revealing that at the time they enlisted Tobias’ assistance in questioning Rice, defendant was represented by counsel on the very matters that they were investigating. Under these circumstances, by questioning defendant in counsel's absence, the Federal authorities interfered with defendant’s representation and infringed upon the existing attorney-client relationship between Rice and his lawyer.
The People appear to argue that because the conduct of the Federal authorities in questioning Rice without counsel was proper under Federal law, and because there was no involvement by New York State officials in eliciting Rice’s statement, Rice’s “indelible” State right to counsel was not implicated; therefore, his statement is admissible. Their argument is unpersuasive. Even if the actions of the Federal prosecutors and their agents did not offend the Federal Constitution, because no “critical stage” right to counsel had arisen under Federal law at the time Rice’s conversation with Tobias was recorded, and were arguably proper under current Federal regulations,[4] Rice’s State constitutional right to counsel was triggered when *760 he retained counsel with respect to the subject matter under investigation and was violated when he was questioned about that very matter in the absence of counsel. As Skinner (supra) teaches, the motivations of the interrogators are immaterial, for the right to counsel is “rendered illusory if the State’s agents are permitted to subject an individual represented by counsel to questioning”. (People v Skinner, 52 NY2d, supra, at 32.) Whether the interrogation is conducted by Federal or State prosecutorial officials is likewise immaterial, because the impact on the right to counsel from questioning in the absence of counsel is the same.
Moreover, compelling policy reasons justify extending the protection of New York’s right to counsel law to the circumstances at issue here. As repeatedly reiterated by our State’s highest Court, “The State right to counsel is a [1] “cherished principle”, rooted in this State’s prerevolutionary constitutional law and developed “independent of its Federal counterpart.” ’ (People v Harris, 77 NY2d 434, 439 [quoting People v Settles, 46 NY2d 154, 160-161].)” (People v West, 81 NY2d, supra, at 373.) Defendant is being tried in State court for crimes defined by the State’s Penal Law, and the conduct giving rise to the assertion of defendant’s State constitutional right would compel the relief requested if colluded in by State officials. Given these strong policy interests in seeing the State’s laws respected, Rice should benefit from New York’s vigilant tradition protecting the right to counsel, even though the statement in question was obtained by Federal authorities pursuant to a Federal investigation. (See, People v Griminger, 71 NY2d 635, 641 [1988] [since defendant has been tried for crimes defined by the State’s Penal Law, he should be afforded the benefit of the State’s search and seizure law even though the warrant was issued by a Federal Magistrate and executed by Federal agents]; see also, Elkins v United States, 364 US 206, 223 [1960] [evidence seized by State agents during search, which if conducted by Federal officers would have violated defendant’s Fourth Amendment rights, is inadmissible in a Federal criminal trial].)
The People’s reliance on People v Ridgeway (101 AD2d 555 [4th Dept 1984], affd 64 NY2d 952 [1985]), apparently for the proposition that New York will not bar evidence at a State trial that was properly obtained by Federal agents in accordance with Federal rules and constitutional mandates, is misplaced. Ridgeway deals solely with the “critical stage” right to counsel that typically arises upon formal commencement of a criminal proceeding by the filing of the felony complaint or *761 other accusatory instrument. In Ridgeway, the defendant argued that the filing of a complaint and the issuance of an arrest warrant in Federal court should have the same effect in activating her New York “critical stage” right to counsel as those acts would have had they taken place in State court. Concluding that Federal activity could not create a State “critical stage” right to counsel in the absence of a State criminal proceeding, the Court distinguished between the right to counsel in the investigatory stage — which depends upon the defendant’s assertion in retaining counsel that he is “ ‘not competent to deal with the authorities without legal advice’ (Michigan v Mosley, 423 US 96, 110, n 2 [White, J., concurring], quoted in People v Cunningham, supra, p 209)” (People v Ridgeway, 101 AD2d, at 561) — and the “critical stage” right at issue in Ridgeway: the New York “critical stage” right “arises in the prosecutorial stage from the procedural fact of the commencement of the criminal proceeding. The right is peculiar to and dependent upon the existence of the particular proceeding. Until there is a criminal prosecution (or significant judicial activity) in which the defendant is entitled to the protection of counsel, there is no need for the protection and no purpose for the rule and the critical stage right simply does not exist.” (People v Ridgeway, 101 AD2d, at 561.)
In contrast, Rice’s State claim is predicated on the right to counsel at the investigatory stage, before initiation of formal proceedings, where counsel has previously been retained with respect to the matter under inquiry. That right was clearly triggered, not by the initiation of a State investigation, but by Rice’s action in retaining an attorney to represent him on the Nauru matter. Moreover, the protection afforded by the right to counsel at the investigatory stage was necessary to shield this existing attorney-client relationship from undue governmental interference.
Finally, my conclusion that the New York right to counsel rule protects Rice from the Government’s clandestine questioning is based on the particular facts developed in the record of the case before me. This decision is intended neither to limit or to inhibit the exploratory function of law enforcement personnel with respect to ongoing or future criminal conduct, nor to hamper legitimate investigations by protecting a suspect who has hired all-purpose counsel to shield himself from all inquiry into his activities. These policy concerns are not implicated in the present case, however, since the People, through Tobias, sought to introduce Rice’s statements respecting past criminal *762 conduct, and since Rice had retained counsel in direct response to the initiation of the civil action alleging his misuse of Nauru’s funds. (See, People v Goldfinger, 149 Misc 2d, supra, at 771.)
For the above-stated reasons, defendant’s motion to suppress statements he made to Glenn Tobias on March 5, 1993, during the course of a surreptitiously recorded call conducted by Federal investigators without benefit of counsel, is granted.

. The claims against Gruber were severed in December 1997 after he became seriously ill and unable to attend the trial. Scheri pleaded guilty to scheme to defraud in the second degree on January 27, 1998. On February 2, 1998, Owen Rice pleaded guilty to scheme to defraud in the second degree and to violating General Business Law § 352-c (1) (the Martin Act).

. Because of the discovery of these documents in the Southern District files and the People’s acknowledgment that the Federal authorities were on notice that Rice had retained Mr. Adkins at the time of the taped call, the issue whether the Federal investigators had “actual” or “imputed” knowledge of Rice’s represented status is not present here. (See, e.g, People v Short, 110 AD2d 205, 207-208 [2d Dept 1985], lv denied 67 NY2d 657 [1986]; People v Stern, 147 Misc 2d 961 [Sup Ct, NY County 1990] [Kleiman, J.], affd 226 AD2d 238 [1st Dept 1996], lv denied 88 NY2d 969 [1996] [knowledge of informant acting as police agent that defendant had retained counsel would not be imputed to police for purposes of determining if noncustodial interrogation was conducted in violation of right to counsel, where knowledge was acquired eight years before informant became a police agent].)

. A recent decision expressly disagrees with the conclusion in People v Goldfinger (supra) as to whether civil and criminal investigations can be deemed “related” for purposes of determining the scope of the right to counsel. (See, People v Wright, 172 Misc 2d 674 [Sup Ct, NY County 1997] [Solomon, J.].) In Wright, the court denied suppression of statements where a detective was aware that the defendant, prosecuted for insurance fraud, had retained an attorney to pursue an insurance claim for items she had alleged were destroyed in the fire. The court concluded that the defendant, who called no witnesses at the Huntley /Dunaway hearing, had failed to sustain her burden of establishing that she had in fact retained counsel in connection with the criminal investigation; thus, her right to counsel had not “indelibly” attached.
The case now before me is distinguishable from Wright (supra). Unlike the dearth of evidence in Wright, here there is ample evidence indicating that Rice anticipated the need to be represented both with respect to civil and criminal charges arising out of the Nauru matter. Moreover, I conclude that the civil and criminal investigations in the case before me are unquestionably “related”, since they arise from “virtually the same” claims and conduct. (See, People v Goldfinger, 149 Misc 2d, supra, at 771.)

. 28 CFR part 77, codifying the Department of Justice’s rule governing contacts by Government attorneys with represented individuals and organizations, was published on August 4, 1994, after the surreptitious contact at issue here. Whatever the merits of the Justice Department’s efforts to exempt its lawyers from the dictates of the Disciplinary Rules — a hotly disputed topic these days (see, e.g., Abramowitz, Ex Parte Contacts from the Justice Department, NYLJ, Mar. 3, 1998, at 3, col 1; United States ex rel. O’Keefe v McDonnell Douglas Corp., 132 F3d 1252 [8th Cir 1998]) — in this case the United States Attorney’s Office concededly did not follow its own internal procedure mandating extended review of any decision to initiate ex parte contact with a represented person.