THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v PAMELA BOWENS, ERIC BOWENS, CARL HENDERSON and PEDRO GOMEZ, Respondents.

First Department, July 2, 1987

## APPEARANCES OF COUNSEL

*Cyrus Vance, Jr.,* of counsel *(Anne Beane Rudman* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Anthony C. Ginetto* for Pamela Bowens, respondent.

*Ira Mickenberg* for Eric Bowens, respondent.

*Richard Joselson* of counsel *(Philip L. Weinstein,* attorney), for Carl Henderson, respondent.

*Mariann Sullivan* for Peter Gomez, respondent.

## OPINION OF THE COURT

Ross, J.

In this multiple defendant case, the District Attorney of New York County appeals from a Criminal Term order, which granted the motions of defendants Ms. Pamela Bowens (Ms. Bowens) and Messrs. Eric Bowens (Mr. Bowens), Pedro Gomez (Mr. Gomez), and Carl Henderson (Mr. Henderson) to suppress postarrest statements; and, the motion of defendant Ms. Bowens to suppress certain items of physical evidence seized from her car, primarily on the grounds that there allegedly was an inordinate period of delay between arrest and arraignment, and further that the police lacked probable cause to forcibly detain defendant Ms. Bowens.

During the early morning hours of November 15, 1984,

defendants Ms. Bowens, and Messrs. Bowens, Gomez, and Henderson, were arrested in New York County. By a seven-count indictment, filed December 19, 1984, a New York County Grand Jury charged these defendants with the crimes of kidnapping in the second degree (Penal Law § 135.20), two counts of robbery in the first degree (Penal Law § 160.15 [4]), robbery in the second degree (Penal Law § 160.10 [1]), coercion in the first degree (Penal Law § 135.65 [1]), grand larceny in the third degree (Penal Law § 155.30 [5]), and, sexual abuse in the first degree (Penal Law § 130.65 [1]).

Following that indictment, Criminal Term directed a hearing on the motions of all of the defendants to suppress their postarrest statements, and on the motion of defendant Ms. Bowens to suppress physical evidence. This hearing took eight days, and the People, as well as the defendants, presented evidence.

Shortly after midnight, on November 15, 1984, New York City Police Officers Jonas Frankel (Officer Frankel) and Jane Perlov (Officer Perlov), who were assigned to the 30th Police Precinct, were on duty, in uniform, and patrolling in a marked police car, in the vicinity of Amsterdam Avenue and 140th Street, in New York County.

At approximately 12:15 A.M., these officers heard a communication over their car radio, which stated, in substance, that a woman from her apartment located at 790 Riverside Drive, in New York County, had reported that she had been kidnapped and robbed five minutes earlier by three black males in their twenties, and that one of the males was allegedly wearing a blue down jacket; furthermore, the complainant claimed that these males were armed with guns and knives; moreover, the complainant asserted the males had fled with a female friend of the complainant, who was also an alleged victim, in a maroon 1984 Honda Accord; and, finally, the complainant believed that her alleged assailants were headed westbound on 157th Street between Broadway and Riverside Drive.

In response to this radio transmission, and based upon their familiarity with the neighborhood, the officers, according to the testimony of Officer Perlov, "took our car to where a car heading down Riverside Drive would have to wind up which is 135th and Broadway". When they arrived at that location, the officers positioned their car, with its headlights on, at 135th Street and Broadway, in the area of the island, which separates the northbound and southbound roadways of Broadway.

The lighting conditions were excellent in the area where the officers were waiting, illumination being provided by street lamps and a nearby large building complex.

Thereafter, at approximately 12:20 A.M., which was about five minutes subsequent to receiving the radio transmission, these officers observed a late model maroon Honda moving eastbound toward them from Riverside Drive. As soon as this Honda reached the intersection of Broadway and 135th Street, it crossed in front of the officers' vehicle and turned south on Broadway. When the Honda made this turn, the officers saw what appeared to be four young black males seated inside that car, and one of them was wearing a blue down jacket.

Immediately, the officers informed Police Central Communications (Central) that they had just seen what may have been the suspect vehicle, and Central advised them to proceed with caution, in view of the report, as mentioned *supra,* that the occupants of the Honda were believed to be armed with guns and knives. Thereupon, the officers requested assistance, turned on their car's siren and roof lights, followed the Honda, and brought it to a halt "at 129th Street and Broadway".

After the Honda stopped, both officers exited their vehicle, and approached the Honda, with their guns drawn, but held to their sides.

Since she believed the Honda's occupants to be armed, Officer Perlov testified that "for the safety of myself and my partner [Officer Frankel]", she directed "the occupants in the rear to put their hands on the seat and the occupants in the front to put their hands up on the dashboard". While these occupants complied with Officer Perlov's command, Officer Frankel talked to the driver of the vehicle.

In pertinent part, Officer Frankel testified: "First I thought there were four males in the car, and when I bent down to look in I saw there was a female [who was later identified as defendant Ms. Bowens] driving * * * I asked the female * * * 'Are you all right?' And she said yes * * * [Then] I asked if this was her car and could I have the license and registration for it". Furthermore, Officer Frankel, a veteran of more than 15 years with the police department, explained in his testimony the reason he requested the license and registration was "To be honest, I was quite dumbfounded when she said she was fine. Based on all the information up to this point, I really expected her to say, 'Thank God, you just rescued me.' When

she said, 'I am fine,' it sort of set me back a little bit. So I said [to myself], let me stall for time; maybe she's afraid, that she's been intimidated; and I said, let me stall for time for her to realize * * * at this point there were lots of police. Again she didn't seem worried or excited, just handed me her license and registration." As mentioned *supra* Officers Frankel and Perlov had requested assistance, and a dozen additional police officers were on the scene, including an officer named Russell Litwenack (Officer Litwenack).

After defendant Ms. Bowens had handed over her license and registration to Officer Frankel, the police ordered defendant Ms. Bowens, and defendants Messrs. Bowens, Gomez and Henderson out of the vehicle to be frisked, since, as mentioned *supra,* the radio transmission had indicated the occupants of the Honda were believed to be armed.

Upon exiting the Honda, the four defendants were frisked by the police to determine if they were carrying weapons. Defendant Mr. Bowens, who was Ms. Bowens' brother, was wearing a blue down jacket. When Officer Litwenack announced aloud that, during his pat down search of defendant Mr. Henderson, he found a pair of chrome handcuffs and a set of keys to them, Officer Frankel directed Officer Perlov, the only female officer present, to search defendant Ms. Bowens.

Prior to conducting a pat down search of defendant Ms. Bowens, Officer Perlov testified, in pertinent part, that Officer Frankel "let me know that from what he ascertained she [defendant Ms. Bowens] was not a victim of a crime." Subsequent to the pat down of defendant Ms. Bowens, Officer Perlov entered the Honda, and found, on its rear floor, a wooden handled butcher knife. The defendants were all handcuffed and driven by the police to the 30th Precinct for further investigation.

Our examination of the hearing transcript indicates that, during the period of time that elapsed from when Officer Frankel asked defendant Ms. Bowens for her license and registration until she was handcuffed, defendant Ms. Bowens never asked for help, or gave any indication that she was a victim of a crime.

At the precinct, Officer Frankel placed the four defendants in a room, where he removed their handcuffs. Except for pedigree information, none of the defendants spoke with the police or offered any statements. Between 12:30 A.M. and 12:55 A.M., the defendants were processed or booked by the desk

officer in the precinct for, among other crimes, kidnapping, robbery and sexual abuse.

In the interim, Officer Perlov, who drove the Honda to the precinct, conducted a further search of the interior of that vehicle, and found two gravity knives in the pockets attached to the back of the front seats.

Shortly thereafter, Ms. Eleanor Branch (Ms. Branch), the complainant, came to the precinct, where she spoke to Officer Perlov concerning the details of the crime allegedly committed against her. In pertinent part, Ms. Branch told Officer Perlov that earlier that evening, defendant Ms. Bowens, who was Ms. Branch's friend, came to Ms. Branch's apartment on Riverside Drive, and, thereafter drove Ms. Branch to a deserted area in Queens for a driving lesson. After they arrived at that location, defendant Ms. Bowens left Ms. Branch alone in the Honda for a few minutes. When defendant Ms. Bowens returned, she was accompanied by three black men, who were later identified as Messrs. Bowens, Gomez and Henderson. Defendant Ms. Bowens explained to Ms. Branch that the three male defendants intended to rob Ms. Branch and defendant Ms. Bowens. Then the three male defendants entered the Honda, and defendant Ms. Bowens returned to the driver's seat. Ms. Branch was unable to see the faces of the male defendants because it was dark, and these defendants had removed her prescription glasses. In the car, one of the male defendants displayed a knife and took one of her rings and some money from her, and when the male defendants demanded more money, Ms. Branch replied that she had none, but that she did have a Citibank card at her apartment. Thereupon, defendant Ms. Bowens drove to Ms. Branch's Manhattan apartment, and Ms. Branch claimed one of the defendants fondled her during this trip. As soon as they reached the apartment, one of the male defendants escorted Ms. Branch upstairs to get her Citibank card, and at that time she succeeded in escaping. Ms. Branch then telephoned the police to report the crime.

Following the completion of Ms. Branch's account of the incident, Officer Perlov took her into the next room, where she identified the defendant Ms. Bowens, as her friend; defendant Mr. Gomez, as the robber, who accompanied her to the apartment to get Ms. Branch's bank card; and defendant Mr. Bowens, as defendant Ms. Bowens' brother.

The four defendants were arrested, and the three male

defendants were placed in a precinct detention cell, while defendant Ms. Bowens was seated outside that cell. In that location all of the defendants were given the *Miranda* warnings, which they indicated that they understood, but they were not then questioned about the crime.

Still later, Officer Perlov searched the Honda once more, and found Ms. Branch's glasses, and a ring (note: on or about November 23, 1984, about a week later, acting on additional information received from Ms. Branch, Officer Perlov retrieved Ms. Branch's gloves from the rear shelf area of the Honda).

Subsequent to telephoning the Career Criminal Investigation Unit (CCIU) to report the crime, which is a standard police practice in all felony arrests, Officers Frankel and Perlov transported the defendants to Central Booking, which is located at One Police Plaza, and the defendants arrived at about 2:30 A.M.

At Central Booking, the defendants were, *inter alia,* each fingerprinted. Subsequently, the defendants NYSID sheets were returned from Albany, between approximately 5:00 A.M. and 8:00 A.M. that morning. Specifically, defendant Mr. Bowens' prints were received at 5:51 A.M.; defendant Mr. Henderson's by 5:59 A.M.; defendant Ms. Bowens' by 6:00 A.M.; and, defendant Mr. Gomez' by 8:00 A.M.

When processing at Central Booking was complete, defendant Ms. Bowens was lodged in a female detention cell at 100 Centre Street, while the three male defendants were retained in a cell at Central Booking, at One Police Plaza.

In view of the fact that precinct detectives were not regularly on duty between midnight and 8:00 A.M., CCIU detectives were responsible for investigating serious felonies, like those allegedly committed by defendants, which occurred during those eight hours. Detective Donald Kendall (Detective Kendall) was assigned to CCIU, and, as soon as he arrived for duty at 8:00 A.M., he was given the case of Ms. Branch to investigate.

By approximately 8:30 A.M., Detective Kendall had sufficiently familiarized himself with the file in complainant Ms. Branch's case that he was prepared to interview the defendants. After introducing himself, Detective Kendall took the three male defendants to his office on the thirteenth floor of One Police Plaza. Subsequently, Detective Kendall interviewed each one of these defendants separately. During the

individual interviews, each one of these defendants waived his *Miranda* rights, gave Detective Kendall a written signed statement, in which each one of these defendants, in substance, admitted his participation in the crime against Ms. Branch, and claimed that it was defendant Ms. Bowens' idea to commit that crime. Specifically, Detective Kendall interviewed defendant Mr. Gomez from 10:30 A.M. to 12:15 P.M.; defendant Mr. Bowens from 12:15 P.M. to 2:00 P.M.; and, defendant Mr. Henderson from 2:00 P.M. to 2:40 P.M.

At approximately 3:40 P.M., Detective Kendall went to the female detention cells, which as mentioned *supra,* were located at 100 Centre Street, to interview defendant Ms. Bowens. After waiving her *Miranda* rights, defendant Ms. Bowens gave Detective Kendall a written statement admitting her participation in the crime. Detective Kendall had interviewed Ms. Bowens from 3:40 P.M. to 4:10 P.M.

While Detective Kendall was conducting his investigation and questioning the defendants, Officer Perlov was in the New York County District Attorney's office for the purpose of having a felony complaint prepared. By the time Officer Perlov arrived at that office, on November 15, 1984, there were 57 other police officers ahead of her for the same purpose, and, therefore, it was not until after 2:00 P.M. that a felony complaint had been prepared for her to sign.

The defendants were arraigned in Criminal Term Part AR 5 at 8:05 A.M., on November 16, 1984, which was approximately 31.5 hours from the time of their arrest, at approximately 1:30 A.M. on November 15, 1984.

The People called as a witness, New York County Assistant District Attorney Robert S. Holmes (ADA Holmes), who had been in charge of the District Attorney's component of the arrest or arraignment process for approximately eight years, and who testified that he was fully familiar with the operation of Criminal Term Part AR 5 on November 16, 1984. In pertinent part, ADA Holmes testified that the statistics indicated that, between the period of midnight to 8:30 A.M., on November 16, 1984, a total of 61 persons, including the 4 defendants, were arraigned; the average elapsed time from arrest to arraignment for each of these defendants was 24.1 hours; and, 27 of the defendants were charged with prostitution related crimes. After setting forth these statistics, ADA Holmes interpreted them, as follows: prostitution cases are simpler, and are, therefore, processed more quickly; thus, if

the 27 prostitution defendants are subtracted from the total of 61 defendants, the average elapsed time from arrest to arraignment rises from 24.1 hours to approximately 28 to 29 hours. Moreover, ADA Holmes testified that, based upon his experience, it took a longer time to arraign cases involving multiple defendants, and the arraignment process was also slowed when the detention facilities are overcrowded.*

All of the defendants testified in their own behalf, and, in substance, claimed their rights to due process had been violated.

Following the completion of the hearing testimony, Criminal Term, in pertinent part (1) granted the motions of all of the defendants to suppress their statements, upon the ground they had not been timely arraigned; (2) granted the motion of defendant Ms. Bowens to suppress the use against her of the physical evidence taken from her car, to wit: the three knives, and Ms. Branch's ring, glasses and gloves, upon the ground that the police were not justified in forcibly detaining defendant Ms. Bowens; and (3) held that the unjustified detention of defendant Ms. Bowens provided an additional ground to suppress the statement that she gave to Detective Kendall.

■■ We disagree.

■ Based upon our analysis of the record *supra,* we find that Officers Frankel and Perlov had probable cause to stop the Honda and to question the occupants, since these occupants and the car they were riding in clearly matched the detailed radio transmission these officers had received barely five minutes prior thereto.

Almost 40 years ago, the United States Supreme Court said that: "[i]n dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" *(Brinegar v United States,* 338 US 160, 175 [1949]). Just recently, the Supreme Court continued to apply this common sense standard in making an evaluation of the appropriateness of police conduct in a search and seizure case *(Illinois v Gates,* 462 US 213, 231 [1983]). The Court of Appeals of this State has held in *People v De Bour* (40 NY2d

---

* This court takes judicial notice *(see,* Richardson, Evidence § 52 [Prince 10th ed]) of the fact that, while awaiting arraignment in New York City, male and female defendants are normally kept in detention facilities located in different buildings.

210, 217 [1976]): "[t]he crucial factor is whether or not the police behavior can be characterized as reasonable". To similar effect, the Court of Appeals ruled in *People v Cantor* (36 NY2d 106, 112-113 [1975]), that: "Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand".

Moreover, we note that reasonableness characterized every aspect of the actions of Officers Frankel and Perlov. In view of the fact that Police Central had cautioned the officers that the occupants of the subject vehicle were armed with guns and knives, Officer Perlov was entirely justified in ordering the occupants to put their hands where the officers could see them. Former Chief Justice Warren wrote for the majority in *Terry v Ohio* (392 US 1, 30-31 [1968]): "We * * * hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken."

Significantly, the police did not remove the defendants to the precinct until after the handcuffs and keys had been found on the person of defendant Mr. Henderson and the knife had been found in defendant Ms. Bowens' Honda *(see, in this connection, People v Brnja,* 50 NY2d 366 [1980]). Furthermore, the police were justified, based upon the circumstances, of this case, to make a further search of the car at the station house, during which search they found the two gravity knives and the complainant Ms. Branch's ring, eyeglasses, and gloves *(see, for example, People v Milerson,* 51 NY2d 919 [1980]).

Criminal Term, in substance, ruled that the police were not justified in detaining the driver of the Honda, defendant Ms. Bowens, since they allegedly acted on a "hunch" in determining that she was a participant in the crime and not a victim.

In view of our examination of the record, we reject that conclusion of Criminal Term, particularly since Criminal Term, itself, found the testimony of Officers Frankel and Perlov to be credible.

We consider the credibility findings of the hearing court very persuasive. This court has repeatedly held that the trier of facts is in the best position to determine credibility, since it observed the witnesses in the crucible of the courtroom (see, for example, People v Wright, 71 AD2d 585, 586 [1st Dept 1979]; People v Stroman, 83 AD2d 370, 372 [1st Dept 1981]; People v Cesar, 111 AD2d 707, 710 [1st Dept 1985]). We find particularly applicable herein these words that we wrote in People v Wright (supra, at 586): "Credibility is determined by the trier of facts who has the advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate court which reviews but the printed record (see People v Cohen, 223 NY 406, 422-423; Fisch, New York Evidence, § 446)".

As mentioned supra, Officer Frankel, an experienced officer, acted very carefully, and nonintrusively before he concluded that, based upon her unusual conduct, defendant Ms. Bowens could not be a victim and was in all probability a participant. For example, when defendant Ms. Bowens was out of the Honda and away from the other defendants, and surrounded by more than a dozen police officers, she still did not give a single indication that she had been a victim and a prisoner of the male defendants. In fact, so sensitive of defendant Ms. Bowens' rights was Officer Frankel, that he did not direct Officer Perlov to pat down search her until after the handcuffs and keys had been found on the person of defendant Mr. Henderson.

Of course, defendant Ms. Bowens had a constitutional right not to respond to the police (see, for example, People v Howard, 50 NY2d 583, 590 [1980], cert denied 449 US 1023 [1980]); but, in the circumstances herein where a violent crime was reported to have been committed, it would be expected that, if she had been a victim, she would have expressed some reaction consistent with that status when she was in the presence of the police. This she did not do. In fact, our examination of the record indicates to us that her attitude and demeanor were entirely consistent with that of the other defendants.

Applying the legal authority, supra, to the facts of the instant case, we find that the police behavior was reasonable

*(People v De Bour, supra)* in detaining defendant Ms. Bowens, and, therefore, her motion to suppress the use against her of the physical evidence found in her car should be denied. Based upon this finding, we conclude that the statement taken from her by Detective Kendall was not the result of an illegal detention.

■ Turning to Criminal Term's grant of defendants' motions to suppress their statements, upon the basis that the inordinate delay in arraignment violated their right to counsel, we find that action to be erroneous, in view of the circumstances of the instant case.

Criminal Term stated:

"I find that the People have sustained beyond a reasonable doubt that the statements made by all four defendants were not the result of physical coercion, intimidation, threats, promises or any of the like, even though they hadn't eaten and perhaps hadn't slept for the hours intervening between their arrest and their statements.

"I make that on the basis of credibility findings. And I think that the statements also were proven to have been preceded twice by Miranda Warnings, once at the precinct house some hours earlier and once by Detective Donald Kendall. And that goes for all four defendants".

We agree.

Furthermore, we find very persuasive the unrebutted testimony of ADA Holmes to the effect that, if the 27 prostitution defendants are subtracted from the 61 defendants arraigned between the hours of midnight to 8:30 A.M., on November 16, 1984, the average elapsed time from arrest to arraignment was approximately 28 to 29 hours. When this figure is compared to the figure of 31.5 hours for the arraignment time in the instant case, we find the difference of approximately two hours to be insignificant. There was no violation of due process, considering that we have multiple defendants of different sexes, requiring that they be lodged in different buildings, and considering that the police investigation was made more complicated by the fact that defendant Ms. Bowens was first believed to be a victim, which was a logical conclusion, based upon the unusual facts herein.

Additionally, we note that, as mentioned *supra,* while Detective Kendall was interrogating the defendants, Officer Perlov was seeking to have a felony complaint prepared, and when the time that the felony complaint preparation process was

completed, sometime after 2:00 P.M., is compared to the time that Detective Kendall completed his last interview, 4:10 P.M., we find that the interrogation process did not unduly delay the arraignment. In fact, it appears that the several different procedures necessary for an arraignment were proceeding simultaneously.

Our examination of legal authority fails to indicate a single appellate case in this State that has granted a motion to suppress statements, upon the single factor of arraignment delay.

Of course, we recognize that motions to suppress have been granted where delay was a factor, but in each such case the delay was coupled with other factors. The Court of Appeals has held in *People v Hopkins* (58 NY2d 1079, 1981 [1983]), "absent extraordinary circumstances, a delay in arraignment is but a factor to consider on an issue of underlying involuntariness *(People v Holland,* 48 NY2d 861; *People v Dairsaw,* 46 NY2d 739)".

In summary, we conclude that the delay in arraignment in the instant case did not have as its purpose to further the objective of permitting the police more time to interrogate the defendants.

Accordingly, order, Supreme Court, New York County (Stephen G. Crane, J.), entered October 21, 1985, which granted the motions of defendants Ms. Pamela Bowens (Ms. Bowens), and Messrs. Eric Bowens, Pedro Gomez, and Carl Henderson to suppress postarrest statements, and granted the motion of defendant Ms. Bowens to suppress items of physical evidence, is unanimously reversed, on the law and on the facts, to the extent appealed from and as limited by the briefs, and the motions denied.

KUPFERMAN, J. P., ASCH, MILONAS and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered on October 21, 1985, unanimously reversed, on the law and on the facts, to the extent appealed from and as limited by the briefs, and the motions to suppress statements and physical evidence denied.