OPINION OF THE COURT
Carolyn E. Demarest, J.
Defendant Daryl Williams moves to suppress several oral, written and videotaped statements obtained from him following his arrest on November 2, 2000, and to suppress a gun recovered from his home in his absence also on November 2, 2000. This case implicates the right of the defendant to be arraigned promptly and his concomitant right to the presence of an attorney to assist him.
On October 22, 2000, in the vicinity of Avenue D and East 48th Street, Brooklyn, defendant Daryl Williams, together with two others also named in this indictment and a fourth unapprehended individual, was allegedly involved in a shooting incident in which shots were fired from a moving vehicle, striking two and causing the death of Jean Bien-Aime. A wanted card for the defendant Daryl Williams was issued out of the 70th Precinct based on information available to authorities. At the hearing, Detective Dennis Murphy of the Fugitive Apprehension Team testified that, based upon the wanted card, he had attempted to locate Mr. Williams at his home at 2501 Nostrand Avenue, apartment 7E, and in the course of such efforts, had previously spoken to his mother, Rosella Bryson. At approximately 2:30 a.m. during Detective Murphy’s tour of duty on November 2, 2000, he became aware of the arrest of Daryl Williams on an unrelated matter, whereupon, at 6:15 a.m., he again proceeded to defendant’s home where he spoke with Ms. Bryson. Ms. Bryson recognized Detective Murphy from his prior visit and told him that she knew her son had been arrested and was “relieved.” Stating that she “knew” the reason for the detective’s presence, she led Detective Murphy *377 into her son’s room and pointed out a Timberland shoebox which contained a .38 caliber revolver and, in a separate Winchester box, live ammunition. Ms. Bryson indicated that the weapon belonged to her son and gave written permission for the detective to remove the weapon from her home “for [her] safety” (People’s exhibit 1).
After securing the revolver, aware that Mr. Williams was wanted on the 70th Precinct homicide as well as a separate case involving a shooting in the 67th Precinct, Detective Murphy and his partner proceeded to the criminal court building and awaited Mr. Williams’ arraignment on the burglary case for which he had been arrested hours before. Detective Murphy testified that he attempted to remove defendant from the basement pens of the criminal court prior to his arraignment but was told that his burglary case “had been docketed” and he would have to wait until after the arraignment. Following Mr. Williams’ arraignment on November 2, as he was leaving the criminal court building at approximately 10:15 a.m., having been released on his own recognizance, Detective Murphy arrested Daryl Williams and removed him to the 67th Precinct, placing him in a cell in the second floor detective squad room. Thereafter, Detective Murphy had no further contact with Daryl Williams. Detective Murphy testified that Mr. Williams said nothing and was asked no questions in his presence.
Sergeant Edward Mullins took control of the defendant at approximately 10:40 a.m. on November 2, 2000, when the defendant was placed in a cell within 10 feet of his office by Detective Murphy. Sergeant Mullins testified to having occasional casual contact with the defendant unrelated to any particular investigation throughout the day up until approximately 10:00 or 11:00 p.m., but the primary investigation into the shooting incident on September 15, 2000, in which the defendant had also been implicated, was conducted during the day by Detective Joseph Calabrese of the 67th Precinct. Detective Calabrese testified that he spoke with the defendant in the 67th Precinct squad office regarding a lineup at approximately 4:00 p.m. on November 2. Between 4:00 and 9:00 p.m., Detective Calabrese arranged to secure the presence of the witnesses on the September 15 shooting and obtained fillers while the defendant remained in the holding cell and spoke to no other individuals. He was permitted to use the restroom during this period of time and provided “something to eat” by Detective Calabrese. At 10:00 p.m. the lineup was conducted and the defendant was identified, whereupon he was formally arrested for the September 15 shooting.
*378 Following the conclusion of the investigation regarding the September 15 incident, Sergeant Edward Mullins initiated an investigation regarding the October 22 homicide which is the subject of this indictment. He testified that the defendant was taken to the apprehension office where he could be made more comfortable, was told of the identification that had been made (apparently with respect to the September 15 crime) and was also told that he faced serious charges as a result. Sergeant Mullins then engaged the defendant in a conversation that included basketball, his daughter, his mother, and the fact that he was in serious trouble. Sergeant Mullins then told the defendant that he could “set things straight” and gave him Miranda warnings from a sheet of paper which is People’s exhibit 9 in evidence. The defendant himself wrote the word “yes” next to each question, as well as various other notations which were meant to establish his coherence. He also signed his name on the Miranda sheet. He was given food and beverage and permitted to use the restroom and was made no promises. He was told, however, that Sergeant Mullins believed that he had been involved in the homicide of October 22. Following the waiver of his Miranda rights, defendant stated orally that he had been attempting to purchase marijuana and had entered a vehicle which he believed to be stolen and began driving around looking for a seller, when the driver “spotted” an individual with whom he had had a prior dispute. After picking up another person who would have guns, they returned to the location of the person who had had the prior dispute and began firing shots at him from the car. Defendant denied doing any of the shooting but said a gun was placed in his hand.
At the conclusion of this first oral statement, defendant was given a pad of paper and asked to write his statement. Left alone, defendant composed People’s exhibit 10 in evidence in his own hand and signed it. Upon reviewing this first written statement, Sergeant Mullins asked some additional questions of the defendant and asked him to write a second statement which is People’s exhibit 11 in evidence, signed multiple times by the defendant in his own hand. Again defendant was left alone to compose his statement. The entire interview process took approximately an hour and a half, following which, the defendant remained at the 67th Precinct throughout the night while the investigation continued, the two codefendants were apprehended and a ballistics examination was conducted on the gun recovered from his bedroom and the bullet removed from the body of the deceased.
*379 On November 3, 2000, sometime after 1:00 p.m., Detective John McGurran approached the defendant regarding the possibility of making a videotape statement to the District Attorney. Defendant agreed to do so and, at 4:17 p.m. on November 3, a videotape statement was given to the District Attorney (People’s exhibit 4). Miranda warnings were repeated by the District Attorney prior to questioning. There is no indication of any coercion or intimidation of the defendant who appears in the videotape to be very cooperative and relaxed in responding to the questions posed. A second video was made soon after exhibit 4 which is not a subject of this hearing and is presumed to be unrelated to the homicide of October 22. Defendant was then returned to his cell at approximately 5:00 p.m. on November 3 where he remained overnight, while the investigation continued. During this time he was given pizza and was observed to be sleeping for extended periods of time.
When Sergeant Mullins reported for duty on the morning of November 4, having left the precinct in mid-afternoon on November 3, prior to defendant’s videotaped statements, he found defendant in the cell outside his office and returned him to the apprehension room for breakfast. Sergeant Mullins testified that the ballistics report had by this time been obtained and indicated that the gun recovered from defendant’s bedroom was the murder weapon in the October 22 shooting. At approximately 8:30 or 9:00 a.m., as he sat with defendant over breakfast, Sergeant Mullins repeated Miranda warnings from People’s exhibit 12, which was also signed by defendant, and then told him of the results of the ballistics testing. Defendant agreed to give further explanation and stated he did not have the .38 but that “Craig” (codefendant Hamilton) had the .38 while defendant had a .380 automatic which he did not fire at anybody, but in the opposite direction. Defendant stated that his two codefendants, Fatal (whom he called Stalky) and Hamilton, both fired at the crowd. Defendant stated he wanted to get out of the car and was angry at being involved. Thereafter, defendant agreed to make an additional video statement, People’s exhibit 13. This videotape also contains a recitation of Miranda warnings by the District Attorney and depicts a highly animated and loquacious defendant Williams who does not appear to have been coerced in any manner. In the video, defendant gives greater detail in explaining the motive for the incident and in describing events, but continues to deny culpability, contending that he was given the gun to hold and was resistant to remaining in the car.
*380 At the conclusion of the investigation, following the final video statement, defendant was permitted to telephone his mother. There is no evidence that he had asked to telephone her earlier and, it is noted, his mother was aware that he was in custody. Defendant was taken to central booking sometime before 2:25 p.m. on November 4, based upon the stipulation of counsel, and was arraigned in criminal court between 5:30 p.m. on November 4 and 1:00 a.m. on November 5.
Suppression of Weapon
Detective Murphy’s testimony regarding the circumstances of the recovery of the weapon at defendant’s home is undisputed and is found to be completely credible. Detective Murphy testified that he had previously visited Ms. Bryson and, when he knocked on her door on the morning of November 2, she opened the door “wide” and “invited” him in. From the testimony, it is clear that the recovery of the weapon was actually instigated by Ms. Bryson who invited the detective into her son’s room and disclosed the presence of the weapon and ammunition which she had found the previous day when she was herself searching defendant’s bedroom. Under such circumstances, there was no need for a warrant to search as defendant’s mother had full authority to give the permission that she did in fact give. (People v Andujar, 267 AD2d 467 [2d Dept 1999]; People v Kelly, 220 AD2d 456 [2d Dept 1995].)
The motion to suppress the weapon and the ammunition is denied.
Probable Cause
One of the issues in this case is whether defendant was properly arrested on November 2, 2000. Detective Murphy effected this arrest based upon his knowledge of the allegations pending against the defendant, but, more specifically, based upon the recovery of an unlawful firearm from his bedroom in his home. The People have suggested that the presence of a “wanted card” alone justified his arrest, but, in the absence of any explanation as to the information pursuant to which that wanted card was generated, the wanted card did not supply probable cause for arrest. However, the lawful recovery of an illegal firearm from the defendant’s bedroom, together with information provided by a reputable, reliable and known source, that being defendant’s mother, did supply the requisite probable cause for arrest.
*381 Admissibility of Statements
Defendant contends that his custodial statements must all be suppressed as having been obtained in violation of his right to counsel.
(1)
Defendant relies initially on his arrest at the criminal court immediately following his arraignment on an unrelated case to support his claim that he was represented by counsel and could not be questioned in the absence of that attorney. Detective Murphy acknowledged that he had observed the attorney for defendant Williams as he appeared on that unrelated arraignment, but had no contact with him. At the time of his apprehension, defendant had been released from custody and was on his way out of the courthouse. Neither defendant himself, nor his attorney from the arraignment, suggested to the police that defendant was represented on this matter. There was no request for an attorney at any time.
In People v Higgins (283 AD2d 440 [2d Dept 2001]), the appellate court unequivocally held that a defendant who is represented on an unrelated pending case upon which he has been released from custody is “competent to waive the right to counsel, in the absence of counsel.” The undisputed testimony establishes that defendant was apprised of his right to counsel several times throughout the period of his detention, and specifically, immediately before he was questioned about the instant incident. He knowingly, intelligently and voluntarily waived all of his Miranda rights, including his right to counsel, in writing, before making any statement. There is no merit to defendant’s argument that his arraignment on an unrelated case caused his right to counsel to attach so as to preclude questioning in the absence of counsel on another case after he had been released from custody. (See People v Steward, 88 NY2d 496 [1996].)
(2)
Defendant’s second contention is that the delay in his arraignment deprived him of his critical-stage right to counsel. From the point of his arrest on the morning of November 2 to his removal from the 67th Precinct to central booking on the afternoon of November 4, defendant was in custody 52V2 hours. To the time of his ultimate arraignment sometime between 5:30 p.m. on November 4 and 1:00 a.m. on November 5, he was in custody a minimum of 55V2 hours and a maximum of 62V2 hours.
*382 CPL 140.20 (1) mandates that a person arrested without a warrant be arraigned before the criminal court upon an accusatory instrument “without unnecessary delay.” The statute allows time for various “processing” procedures. In People ex rel. Maxian v Brown (77 NY2d 422, 427 [1991]), the Court of Appeals interpreted the statute to require “that a prearraignment detention not be prolonged beyond a time reasonably necessary to accomplish the tasks [recording, fingerprinting, etc.] required to bring an arrestee to arraignment.” Relying on the findings of the trial court, the Court of Appeals agreed that in a large urban area, such as New York City, the necessary preliminaries can be concluded within 24 hours and that a period of delay beyond that, unless justified with a reasonable explanation, is presumptively “unnecessary” and in violation of the statute.
In People v Wilson (56 NY2d 692 [1982]), the Court rejected the argument that physical police custody pending arraignment, prior to the preparation of a complaint, alone caused the right to counsel to attach so as to require suppression of statements obtained in the absence of counsel. (Accord, People v Hopkins, 58 NY2d 1079 [1983] [in which delay in arraignment was recognized as a factor to be considered in assessing the voluntariness of prearraignment statements].) However, in People v Cooper (101 AD2d 1, 10 [4th Dept 1984]), upon which defendant relies, an exception to this general rule was annunciated: “i.e., that if there has been unnecessary delay in filing the accusatory instrument or in arraignment, and the police have caused this delay for the purpose of depriving the defendant of his right to counsel, his critical stage right to counsel will be deemed to have arisen.” Quoting People v Blake (35 NY2d 331, 340), Justice Hancock wrote in Cooper (at 10) that undue delay is “ ‘prima facie a suspect circumstance suggesting that the delay may have been for the purpose of depriving the accused of counsel’ and the prosecution has ‘the burden to explain and offer proof * * * why the opportunity to so have counsel * * * was not afforded.’ ” The People had the burden to provide an acceptable explanation for the protracted delay in this case.
At the time of his arrest at 10:15 a.m. on November 2, defendant was suspected of participating in three separate criminal acts: the possession of the weapon recovered from his home earlier in the morning; a shooting in the 67th Precinct on September 15, 2000; and the homicide of October 22, 2000. Upon defendant’s return to the 67th Precinct, Detective Cala *383 brese acted promptly in arranging the necessary lineup regarding the September 15 incident. This investigation was not unnecessarily prolonged but concluded with the formal arrest of the defendant following his identification at the lineup at 10:00 p.m. on November 2, within 12 hours of his apprehension. The investigation into the October 22 homicide was thereafter promptly commenced by Sergeant Mullins who met with the defendant and, after giving him his Miranda warnings, asked him about his participation in that incident. The defendant voluntarily supplied an oral and two written statements confirming his participation and identifying his coperpetrators. At 11:30 p.m. on November 2, based upon the statements given by the defendant, Sergeant Mullins had sufficient information from which to draft an accusatory instrument against the defendant for the October 22 homicide. Although defendant had sought to exculpate himself, Sergeant Mullins apparently suspected that the defendant had actually been the shooter but had no concrete proof to that effect with which to confront the defendant. He therefore delayed the arrest processing of the defendant while the ballistics report was prepared and the codefendants were brought into the precinct.
The court notes that in a homicide case it is customary to obtain a video statement through a “riding” Assistant District Attorney promptly following an admission by an accused at any time of the day or night, but in this case no attempt was made to videotape the defendant’s statement until the following day. Detective McGurran testified that it was not until after 1:00 p.m. on November 3 that he even suggested to the defendant that a videotape statement be made, after the defendant had already been in custody for 27 hours. Two videotaped statements were taken from the defendant between 4:00 and 5:00 p.m. and were concluded at approximately 5:00 p.m.; however, defendant was retained at the precinct for an additional 15V2 hours until Sergeant Mullins resumed questioning at approximately 8:30 a.m. on November 4. Between 8:30 a.m. and 2:25 p.m. on November 4, with the results of the ballistics testing in hand, Sergeant Mullins was successful in obtaining additional statements from the defendant. The defendant was not removed to central booking in preparation for his arraignment in criminal court until approximately 2:25 p.m. It has not been established exactly what time he was actually arraigned, but it is agreed that he was not arraigned until some time after 5:30 p.m. on November 4 and possibly as late as 1:00 a.m. on November 5. The People contend that this *384 extraordinary period of delay was necessitated by the need for additional “investigation.”
Simultaneous with Sergeant Mullins’ and Detective Calabrese’s investigations regarding defendant Williams’ participation in the incidents of September 15 and October 22, Detective John Nelson of the Brooklyn South Homicide Squad was also investigating the October 22 homicide. Detective Nelson testified that he had unsuccessfully interviewed the codefendant Sean Fatal on October 24 at the time of an unrelated arrest and had previously spoken to various witnesses who identified Mr. Fatal in connection with the October 22 homicide. Beginning at approximately 2:00 p.m. on November 3, Detective Nelson conducted several interviews with codefendant Craig Hamilton. Though not the “target of [his] end of the investigation” (transcript at 58), Detective Nelson also sat in on the videotaped statement given by defendant Williams at 4:17 p.m. after an interview with Craig Hamilton during which Hamilton wrote a statement (People’s exhibit 6) inculpating both Daryl Williams and Sean Fatal in the shooting of October 22. Although, like Williams, Hamilton placed himself in the car with his codefendants, he disclaimed complicity and denied any prior knowledge of the presence of guns in the car or the intent to fire them. Hamilton stated that he saw Daryl Williams “putting the gun away.” In contrast, defendant Williams had placed the guns in Hamilton’s possession. At 5:20 p.m. on November 3, soon after the conclusion of Williams’ videotaped statements, Hamilton was also interviewed by the District Attorney on videotape. If there was any question of the sufficiency of Williams’ statements of November 2 as a foundation for an accusatory instrument, certainly the information supplied by Hamilton on the afternoon of November 3 provided the detail necessary to bring charges against Williams at that time.
However, throughout the night of November 3 and into November 4, while defendant Williams remained in his cell at the precinct, together with Detective McGurran, Detective Nelson continued his investigation, returning repeatedly to speak to defendant Hamilton about the incident of October 22 and its basis in gang activity involving the Bloods and Crips and obtaining a detailed description of the .38 caliber “rubber grip chrome police issue” that was purportedly used by defendant Williams (transcript at 76). Detective Nelson testified that up until 1:00 p.m. on November 4, “[i]t had been going back and forth between the bosses and the squad and the D.A.’s office *385 what they wanted, to do with Hamilton; was he going to be a witness; was he going to be a collar” (transcript at 77). In light of the discrepancy between the statements of Williams and Hamilton (Fatal gave no statements), the results of the ballistics testing on the gun recovered from Williams’ bedroom became critical.
The ballistics testing, including a comparison of the gun recovered from defendant Williams’ room with the bullet recovered from the body of the deceased, was completed sometime on November 3. The report was available to Sergeant Mullins on the morning of November 4 when he resumed his questioning of defendant and obtained his admission to firing a .380 automatic. Confronted with the ballistics report, defendant Williams maintained that it was Hamilton who had fired the .38. At 1:00 p.m. on November 4, after defendant Williams had again been interviewed, Hamilton was transported to the District Attorney’s office where he was polygraphed and subsequently questioned further. By this time, defendant Williams was in central booking. It would appear that at least part of the reason for the delay in arraigning Williams was the need to determine the charges to be brought against Hamilton.
The need to continue investigation in order to “unravel conflicting accounts,” particularly where a defendant’s participation in a crime is “intertwined” with codefendants, has been recognized as a legitimate explanation for delay in arraignment. (People v Haywood, 280 AD2d 282 [1st Dept 2001]; see also, People v Bowens, 129 AD2d 297 [1st Dept 1987].) The need to investigate further to determine the propriety of more serious charges may also warrant delay. (See People v Johnson, NYLJ, Jan. 30, 1995, at 28, col 4.) And the need to question an arrestee regarding unrelated crimes in which he may have been involved has also been credited as an acceptable explanation for delays in arraignment. (People v Beale, 283 AD2d 653 [2d Dept 2001]; People v Faison, 265 AD2d 422 [2d Dept 1999]; People v McFadden, 261 AD2d 417 [2d Dept 1999]; People v White, 259 AD2d 508 [2d Dept 1999].) Hence, the delay occasioned by the investigation into the September 15 shooting was entirely justified and will be excluded from the period of defendant Williams’ prearraignment detention relating to this case. For the purposes of this decision, defendant’s detention is deemed to have begun at 10:00 p.m. on November 2. Thus, on this matter, defendant was in custody at the 67th Precinct for 401/2 hours prior to his removal to central booking.
*386 However, this is not a case in which a defendant’s complicity in other crimes is revealed during the investigation of arrest charges so as to justify additional questioning. Defendant was implicated in, and indeed arrested for, the October 22 homicide well in advance of any interrogation regarding that crime. Nor was there any question of “more serious charges” since the homicide occurred 10 days prior to the arrest and defendant’s own admissions between 10:00 and 11:30 p.m. on November 2 supported an in-concert charge of murder in the second degree.
The initial interrogation by Detective Mullins lasting an hour and a half and resulting in an oral and two written inculpatory statements was entirely reasonable and justified. The defendant was told his rights and was permitted to read them for himself. He waived them in his own hand. There is no evidence of coercion or deprivation calculated to overbear the defendant’s will. Defendant was placed in the apprehension office to make him more comfortable. He was not cuffed, threatened or promised anything. His statements to Sergeant Mullins on November 2 are admissible as having been voluntarily given.
It is not clear why the District Attorney was not called in immediately to videotape defendant’s statement or why no effort was made to secure his statement on videotape until after 1:00 p.m. on November 3. It is possible that the police were actually trying to evaluate defendant’s contentions that he was an innocent participant forced against his will. Perhaps Hamilton’s participation was in doubt, as evidenced by the charges brought against him. (He was not charged with the homicide.) However, it was not reasonable to hold Williams for over 40 hours in order to secure the ballistics report with which to confront him when Hamilton’s statements, together with his own, provided more than sufficient evidence to charge him. Depriving Williams of a prompt arraignment at which he would have been afforded advice of counsel cannot be justified by the desire to resolve the charges to be brought against the codefendant Hamilton.
In People v Mosley (135 AD2d 662 [2d Dept 1987]), a 40-hour delay in arraignment required suppression of defendant’s confession to robbery and murder where he had confessed to the charge upon which he had been arrested, tampering with a witness, within an hour of his arrest, but was held and subjected to continuous questioning regarding several other crimes for approximately 24 hours, during which the subject confession was obtained. The Court reasoned that because po *387 lice had sufficient evidence to prosecute defendant on the charges for which he had been arrested, including an unrelated attempted robbery, he should have been arraigned on the morning following his arrest. The delay in doing so was therefore unnecessary and was found to have been caused by the police for the purpose of depriving defendant of his critical-stage right to counsel in order to elicit a confession. (See also, People v Vides, NYLJ, Oct. 18, 1994, at 26, col 4; People v St. Louis, NYLJ, Oct. 25, 1993, at 25, col 5.)
The case at bar is considerably more complicated than Mosley. There were multiple defendants in custody and under interrogation, each of whom provided a slightly different version of events. As noted, the first 12 hours of defendant’s custody is attributed to the September 15 investigation and the initial inquiry regarding the October 22 shooting that ended at 11:30 p.m. on November 2 was clearly reasonable. The delay in obtaining the first videotaped statement to the District Attorney taken approximately 17 hours later is questionable, but may be justified in light of Detective Nelson’s ongoing efforts to reconcile discrepancies in the evidence, particularly the statement of codefendant Hamilton. However, the additional delay to defendant Williams’ arraignment, in excess of 24 hours following the videos on the afternoon of November 3, cannot be justified. The evidence supports no other conclusion than that the police were deliberately delaying defendant Williams’ arraignment in order to obtain a further admission to firing the shots that killed Mr. Bien-Aime. Certainly there could be no other purpose for awaiting the outcome of the ballistics tests and then confronting defendant with the accusation that his gun had fired the fatal shot.
The People cite People v Carbonaro (21 NY2d 271 [1967]) to support their argument that the delay in arraignment did not render defendant’s statement involuntary. However, the delay in Carbonaro was a total of 28 hours from his arrest to arraignment, not the 40V2 to 62 V2 hours involved here. In Carbonaro, the Court found consideration of the delay to be a relevant factor in assessing the voluntariness of defendant’s statement, concluding that such delay was “unquestionably unnecessary” given the evidence available upon which to charge him earlier, but was properly given “little weight” in light of the overwhelming evidence of guilt, including identifications by several eyewitnesses and incriminating physical evidence. Here, defendant Williams had implicated himself. The evidence that became available to police during the period *388 of his interrogation was the conflicting statement of another “perpetrator.” The only purpose for the delay was to confront defendant Williams with ballistics evidence in the hope of obtaining a further inculpatory statement.
Under the facts of this case, this court finds the reasoning set forth in the dissenting opinion of Judge Fuld in Carbonaro most compelling. Relying upon the same statutory mandate of CPL 140.20 (1) contained in its predecessor statute, section 165 of the Code of Criminal Procedure, to arraign “without unnecessary delay,” Judge Fuld found that the willful failure of the police to observe this mandate in order to further question in the absence of counsel so as to obtain sufficient evidence to convict required a reversal of the conviction. Judge Fuld noted that “the only method that might possibly stop such unlawful procedures is to prohibit the use of statements so procured.” He concluded: “The worst of men is as much entitled to the protections of our law as is the most respected member of society.” (Id. at 280; see also, People v Snyder, 297 NY 81, 92 [1947].)
The motion to suppress defendant’s first oral statement on November 2, his two written statements on November 2 (exhibits 10, 11) and the videotaped statement to the District Attorney on November 3 (exhibit 4) is denied. However, because defendant’s prearraignment detention exceeded permissible limits of necessary delay pursuant to CPL 140.20 and was calculated to cause his arraignment and the attachment of his indelible right to counsel to be unnecessarily delayed for the sole purpose of obtaining further inculpatory statements, the oral statement made to Sergeant Mullins and the videotape made on November 4 (exhibit 13) are deemed to be involuntary as a matter of law and are suppressed.